Supreme Court. New York Special Term, December, 1848. Before *Edmonds*, Justice.

In the matter of Joseph Belt, an alleged fugitive from service in the state of Maryland.

In a proceeding on habeas corpus under the Revised Statutes, the averment of a person claimed as a fugitive from service that he is a freeman, is a sufficient answer to the allegation by the claimant that such person is his slave, and a demurrer to such answer on the ground that it is argumentative and evasive will be overruled.

In submitting proof of the claim to the alleged fugitive, the contemporaneous acts of the fugitive and the claimant during the period when the relation of master and slave is said to have existed between them, may be shown by the claimant.

The general rule of evidence in regard to the proof of the laws of the various states of the union, stated in Greenleaf's Evidence, § 489, has not been adopted by the courts of the state of New York, and is not the rule therein, excepting so far as it is enacted by the act passed April 12, 1848, entitled "an act relative to the proof of the Statute and Common Law of other States, &c." (p. 442).

The provision of the new Code, that no person shall be excluded as a witness by reason of his interest in the event of the action, does not extend to cases of habeas corpus, and the claimant to an alleged fugitive from service can not testify in behalf of his claim.

A general understanding that the laws of any state tolerate slavery, does not exempt a judge from requiring lawful evidence thereof, and failing to give such evidence the claimant of an alleged fugitive fails to establish the main point in his case, issue having been joined thereon that the person was bound to him in service.

It being sufficiently proved that the alleged fugitive was bound in service to the claimant, yet, if the claimant, instead of removing him from the state without delay, has detained him in his own custody, that is a sufficient reason why the person is entitled to his discharge. There is only one case in which a fugitive slave can be kept by his master in his personal charge in this state. and that is under the law of Congress, to take him without delay before the proper authority, in order to obtain the certificate necessary for his removal from the state. When it appears that the claimant holds his slave in this state, not for the purposes contemplated in the act of Congress, but that he holds him as his slave because he owes him servitude, it is the duty of the judge to order him to be discharged from custody.

On the 21st day of December, 1847, on an affidavit made by Thomas Peck, of the city of New York, setting forth, that

on the 20th December (the day preceding), Joseph Belt, while walking with the deponent in Duane street, in the said city, was kidnapped by some persons, to the deponent unknown, and was carried off; and that the deponent had just learned that the said Belt was carried to Gravesend, on Long Island, by his kidnappers, and was there detained by their waiting for a change of wind, to be carried to the south as a fugitive slave; and that deponent believed that he would be carried out of the state before he could be relieved by a writ of habeas corpus; a writ was issued by Judge Edmonds, in pursuance of the provisions of the Revised Statutes, addressed to the sheriff of Kings county, or to any policeman of the city of New York, reciting the facts set forth in the affidavit, and commanding the party addressed to take the said Joseph Belt, and him forthwith bring before the judge issuing the same at the City Hall of the city of New York, to be dealt with according to law.

The sheriff of Kings county, Daniel Voorhis, deputed Russell F. Hulse, a police officer of the city of New York, to execute the process; and Hulse, assisted by Samuel Wolven, a police officer of the city of Brooklyn, proceeded immediately to Gravesend, and on the next day returned that he had executed the writ, and had the person named therein in custody.

On the hearing before Judge Edmonds on the same day, Mr. John Lee, of Maryland, with his counsel, James R. Whiting, appeared and claimed the custody of Belt as his fugitive slave, and prayed time to put in a return to the writ in the form prescribed by law, which was duly granted, and the hearing postponed until the next morning, when the following answer was put in.

"I, John Lee, of the county of Frederick, in the state of Maryland, do return to the annexed writ, that a colored boy named Joseph Belt, the person now present, at the time of the service of said writ, was under my restraint, and that I claim to hold him under my restraint as a person held to labor and service due to me as a citizen of the state of Maryland. That said Belt is a fugitive from said state, and from my service in the

said state of Maryland, under and by virtue of the laws of which state he is held to labor and service as a slave to me.

" I do further return, that said Joseph Belt ran away from me in the month of November, one thousand eight hundred and forty-seven. That at that time he was in Baltimore, in the said state of Maryland, in my service, and he privately, against my knowledge and consent, with a view to effect his escape from my service, to which he was lawfully held, and (as I believe) proceeded to Lynn, in the state of Massachusetts, and from thence to the city of New York.

" That on Wednesday last the 20th of December instant, I caused the said Belt to be arrested and brought to me, from which time and until the service of the annexed writ he was in my custody and control, as his master and owner, and I claim it to be the duty of your honor to restore the said Belt to my custody from whence he has been taken by the annexed writ, together with a certificate sufficient to warrant me in removing said slave and fugitive from labor to the state of Maryland aforesaid, from which he fled, without any further molestation or interruption.                                    JOHN LEE

Sworn this 23d day of December, 1848.
          J. W. EDMONDS.

Accompanying the answer were the affidavits respectively made by Theodore C. Shadbolt, of the city of New York, and William Hunkey and H. R. Howlett, of Gravesend, in the county of Kings, stating that in conversation they had with Belt, he had admitted that he was the slave of Lee, that his master had brought him to Baltimore to sell, and that he had run away from him at Baltimore, and had gone from there to Lynn, near Boston, in the state of Massachusetts, whence he had come to the city of New York.

*John Jay*, appeared as counsel for Belt, and asked time to put in a reply on his behalf, and the hearing was adjourned to the 26th December, when the following reply was made:

" I, Joseph Belt, not admitting that at any time I have been legally held to service or labor to John Lee, but insisting that

I am a free citizen of the United States, and not legally held to service or labor, do allege that whilst passing through Duane street in the city of New York, in the state of New York, on the 20th day of December, 1848, in company with Thomas Peck, about half past eight o'clock in the morning, I was seized by two persons whom I believe to be Charles Bird and Sydney Clayton, and forcibly and violently thrust into a hack carriage, the door of which was immediately closed by the driver. That the question being asked why I was so seized, it was stated by the persons arresting me, that I was charged with stealing at the fire. That both myself and Peck denied having stolen any thing, and insisted that we had not been out on the night before, at which time the fire was said to have taken place. Not regarding this denial, handcuffs were placed by these men upon me, but as handcuffs were about being placed on one of the arms of Peck, he was ordered to get out of the hack, and was told he was not the man. Peck refused to get out of the hack, desiring to go with me, but at my request he left the hack to inform Mrs. Jackson, at whose house I boarded, of my arrest. The persons in the hack told Peck they would take me to the Tombs, where he might find me. After Peck left I was carried to a hotel in Broadway, and then to the residence of Charles Bird, in Eldridge street, in the city of New York.

"The two men in the carriage who had hand-cuffed me, stated that they were going to take me to Long Island and keep me there until they caught some other person; that then they would bring me back to New-York and have me tried, but did not say for what they intended to try me. That at the hotel in Broadway, a man named John Lee came into the hack, and said to me, "I will pay you for all this." One of the men got out at the hotel when Lee entered the hack. On arriving at Eldridge street I was compelled to get out of the hack, go up stairs into a room, when Lee and Bird questioned me about the whereabouts of some person I knew nothing of. After remaining about fifteen minutes I was placed in the hack again with Bird and Clayton, and driven across a ferry in the East river and carried about ten miles to a village on the ocean

beach. There I was placed in a room until Thursday evening, the 22d instant, when I was removed to another house, about a mile and a half distant from that I had been first placed in. I remained there by force and restraint until Friday morning about 1 o'clock when I was brought back to the city by officer Hulse, under the warrant issued by his Honor, John W. Edmonds. I was deprived of my liberty without any process of law. The seizure of me in the public street was done in a riotous manner, in breach of the peace, with illegal violence. From the time of kidnapping by the said Bird and his associate Clayton, on Wednesday morning, the 20th instant, until Friday morning, the 22d instant, I was kept hand-cuffed and restrained of my liberty. When notice was given that officer Hulse had arrived with a warrant, Clayton hastily took off the hand-cuffs and asked me to get out of the window, intending as I believed, to recapture me; I declined to go out of the window; went through the door into the adjoining room, and met officer Hulse.·

I believe that Lee, Bird and Clayton have entered into a conspiracy to kidnap me, and carry me away out of the state of New-York. That Lee has promised to indemnify Bird and Cayton against any harm they might suffer from violation of the laws of the state of New-York. That the intention of all these parties was to keep me in irons in this state, secretly and without the knowledge of the public authorities, until they had succeeded in kidnapping some other person. At no period since my arrest has any process of law for my arrest or detention been exhibited to me or alleged to have been issued. At the time of my arrest I was not half a mile from the ferry to Jersey City, and the train for Philadelphia, which is the most direct route for Baltimore in Maryland, did not leave until 9 o'clock A. M. That I have been informed and believe there were eight regular departures or modes of travel from this city to Philadelphia and southward between eight o'clock on the morning of the 20th December, and 1 o'clock A. M. of 22nd December, and there were other irregular departures. The village where I was detained, was, I believe, Gravesend, on

---

In the matter of Belt.

---

Long Island, and is in a direction contrary to that of any route leading to Philadelphia and southward, and there are no regular means of communication from Gravesend to Philadelphia.

Sworn this 26th day of December, 1848,        his

before me. HENRY VANDERVOORT,     JOSEPH ✕ BELT.

*Clerk of Sessions, &c.*       mark.

To this reply, Lee put in a general demurrer.

*For the Demurrer. J. R. Whiting,* upon the whole facts stated, contended —

1. That upon the pleadings in this cause, it was clearly to be inferred, that the boy Joseph was a slave belonging to Mr. Lee; that the averment that he was a free man, was no answer to the allegation of Lee, that he was a slave; that the reply was argumentative and evasive; and he claimed of the court to decide that he was now a fugitive slave.

2. That, if a slave, the master had a right, under the constitution of the United States, to arrest him in this state, either himself, or by the persons whom he employed, without warrant, and take him home with him.

3. That in the manner of the arrest, or in the detention of the slave, though done as stated in the reply, there was nothing to impair his right to the slave; and he demanded of the court, that the boy should be delivered to him as his slave.

In enforcing his claims, Mr. *Whiting* complained of those who interposed in aid of the boy, as attempting to rob Mr. Lee of his property, and agitating a subject which puts the union of the states in jeopardy. He cautioned all concerned against being led away by sympathy.

*Against the Demurrer. John Jay, Asa Childs,* lately of the Maryland bar, and *John McKeon,* district attorney of the city and county of New-York (who appeared in the cause under the provisions of the statute of the State of New-York, passed May 6th, 1840, requiring the district attorney of each county, upon due notice, to render his advice and professional services in all

In the matter of .Belt.

proceedings for the recovery of alleged fugitives from service or labor), presented and argued the following points —

I. This is not a proceeding under the act of congress for the delivery of fugitives. The alleged master has not come here voluntarily for a certificate, but he has been dragged here by force of law, on a complaint entered on behalf of Belt. That act, therefore, has nothing to do with these proceedings, and no certificate can be properly demanded under it. The judge will be governed by the provisions of the revised statutes (2 *vol.* 469, § 40 *and* 41), and discharge the party unless legal cause be shown. Belt stands here as a free citizen of a free state, and the court will so regard him until the contrary be proved in accordance with the usual rules of evidence. Even admitting that he has been held as a slave by Lee, and has escaped from him, it does not follow that he was legally held. He may have been kidnapped from a free state, and reduced to slavery unjustly. (*See Law of New-York of* 1844, *appointing agents to recover citizens who had been kidnapped.*) His insisting, therefore, that he is not legally held to service, but is a free citizen, is a sufficient denial under 2d revised statutes (*page* 471, § 50). This is a matter affecting liberty, and every intendment is to be made in favor of freedom. The proceeding is a summary one, and the strict rules of pleading are not required to be followed, provided the sworn answers are sufficient in substance. The reply is, therefore good, and the demurrer should be overruled.

II. Even if the reply of Belt be construed as admitting that he was the slave of Lee, which it does not; and if the court were sufficiently satisfied of that fact, *which they can not be by any admission expressed or implied,* still the other facts shown by the reply sufficiently show that the *imprisonment in which he was found on the service of the writ* was illegal:

*First.* Recapture of slaves can only be made either under the act of congress of 1792, or under the constitution of the United States.

Belt was not captured under the act, for he was not taken

before a magistrate, nor any certificate obtained for his removal. His capture, to have been legal, must therefore, have been under the power conferred by the constitution. But if the constitution does give such right, it gives it only *where it can be done without a breach of the peace or illegal violence.* (*In re Kirk*, 4 *N. Y. Leg. Obs.*, 459, *quoting Prigg* v. *Commonwealth of Pennsylvania*, 16 *Peters*, 539.) The owner's privilege being in derogation of state rights — the rights of every free citizen are to be preserved — the power to seize the slave is coupled with the condition that there be no illegal violence; and if the condition is broken in the execution of the power, the power is gone, and the arrest is void. Here there was *illegal violence towards a free citizen, Peck,* in the arrest of Belt; *and* an infringement upon the public peace; and the arrest of Belt was therefore illegal *ab initio,* and any subsequent detention under it void.

*Second.* The answer shows the detention to have been illegal, even if the arrest were good. The power of recapturing slaves, is in derogation of state sovereignty and common law right, and must be strictly followed. It is given simply for the purpose of *removing the slave to the state from whence he fled.* (*See Act of Congress,* 1792.) The owner is entitled to reasonable time to recover his slave, but may not detain him here for his convenience. Here, no intention immediately to remove the boy appears, *but the contrary.* Belt was taken from the city of New York, the usual port of departure where opportunities for removal abound, to a remote village, and moved from house to house for the *purposes of confinement and concealment,* until an indefinite period, when some other alleged slave should have been captured. Such detention can not be justified under the facts shown, nor could it have been justified if a certificate had been previously obtained by Lee under the act of congress, for such certificate warrants not the detention of the slave in the state, but only the *removal of the slave* out of the state. (*See Revised Statutes,* 662 [*repealed*], *that slaves became free if continued here beyond time specified; and Act of May 6, 1840, Gen. Stat. page 330, § 7, that the removal must be by direct route.*)

And under the principle settled in the case of slaves (18 *Pickering*), the voluntary detention of Belt in a free state by his master, entitles him to his freedom.

*Third.* If the demurrer is overruled, and the reply held sufficient, Belt is entitled to be immediately discharged. The reply shows his right to freedom, apart from any facts that might be produced touching his former condition, and as it is in the discretion of the court to decide finally on the present hearing, they will not detain an innocent man, who is to be held free until proved to be a slave, in order to allow the respondent to procure or manufacture proofs of his having been once a slave. He should have brought legal proofs when he first came to arrest him.

The counsel for Belt, in reply to the charge of interference with the constitutional rights of the claimant, maintained that the claimant admitting Belt to have been his slave, had, in his arrest and detention in the manner proven, overstepped the farthest limits of his authority, and committed an outrage upon the dignity of the state of New York, and the peace and quiet of its citizens.

*Whiting*, in reply—quoted *Sergeant on the Constitution*, ch 31, page 387; *Glen* v. *Hoages*, 9 *Johnson*, R. 69; *Wright* v. *Dean*, 5 *Ser. & Rawle*, 62; *Commonwealth*, *&c.* v. *Griffin*, 3 *M'Lean*, 480.

The court after taking time for examination overruled the demurrer, adjudging the reply sufficient, and allowed Lee to submit proof in support of his claim.

Thomas Lee, *sworn as a witness for the claimant.*—I reside in Frederick county, Maryland, and have resided there all my life. I am twenty-nine years old, and am nephew of the claimant. I know Belt perfecty. He is the man now here. I have known him as long as I can recollect, upon the estate of the claimant in Frederick county, Maryland, where he resides. He was always on that estate when I knew him; he was born the

slave of John Lee, and was always in his service; I knew his mother, who was also in his service; she was a slave also. I knew his grandmother; she was on the same estate, and is still living. Belt is about twenty-two years old. I saw him last until yesterday in the railroad cars going to Baltimore; Lee was with him. I am pretty well acquainted with the laws of Maryland.

*Question by counsel for claimant.*—Do those laws authorize slavery?

To this question the counsel for Belt objected, and after an argument thereon, the court overruled the objection and allowed the question to be put.

*Answer.*—Yes, sir, they do.

*Question by counsel for claimant.*—Do you hold slaves under those laws?

Objected to, and the objection sustained by the court.

*Cross-examined by* McKEON *of counsel for Belt.*—Mr. Lee sold Belt's mother as a slave. My estate joins that of Mr. Lee. I know the boy was not born in New York or Pennsylvania, but I was not present at his birth.

*Direct examination resumed.*—Belt went to Baltimore as a house servant.

*Question.*—Did your ever hear of Belt's claiming to be free from the service of the claimant?

To this question the counsel for Belt objected, insisting that no previous acts or expressions of Belt could be received as evidence to prove that he was a slave; and after hearing an argument on the point, the court overruled the objection, and declared that the contemporaneous acts of the parties might be shown.

*Direct examination resumed.*—I never heard of Belt's claiming to be a free man. I have heard Belt call Mr. Lee master. Belt was always considered by the other slaves on the estate as a slave. People resident there are acquainted with each other's slaves in the neighborhood. Belt was always reputed in the neighborhood to be a slave. I have not the slightest doubt as to Belt's identity

*Cross-examination resumed.*—Belt is a *mulatto.*

The counsel for the claimant here offered the laws of Maryland from their statute book, and objection being made by the counsel for Belt, quoted 1 Greenleaf on Evidence, § 489, and the decisions there quoted being held· by the court to be inapplicable to the state of New York, a different rule having been adopted by the courts of that state, the counsel referred to a recent statute of the state of New York, passed April 12, 1848, entitled " An Act relative to the proof of the statute and common law of other states and territories."   " § 1. Printed volumes, copies of the statute laws of any other of the United States or of the territories thereof, if purporting to be published under the authority of the respective governments, or if commonly admitted and read as evidence in their courts, shall be admitted in all courts of law and on all other occasions in this state as *prima facie* evidence of such laws."

The volume offered in evidence was objected to by the counsel for Belt on the ground that it did not appear that it was published " by the authority of the government of Maryland," and there was no evidence that it was a volume commonly admitted and read in their courts.   The counsel for the claimant proposed to prove by a resident of Maryland, that the volume offered was the regularly authorized edition of the laws of the state, and as such was recognized and read in their courts, and for this purpose called, as a witness,

*John Lee,* the claimant in person, whom he was about to examine, when *Jay* on behalf of Belt objected on the ground that Mr. Lee being directly interested in the result was utterly incompetent to testify in the matter.

*Whiting.*   By the new code no person is excluded by reason of his interest in the event of the action.   Mr. Lee is perfectly competent.

*Jay.*   If the code authorizes the claimant in a matter involving personal liberty to testify in his own behalf, it is clearly unconstitutional.   Our common law rights in this matter are

part of the constitution, and are not to be overthrown by an act of the legislature.

*The Court.* Whatever may be thought of the code generally, it is not unconstitutional, for it expressly excepts the new rule of evidence from all cases of this kind, and the testimony of Mr. Lee is inadmissible.

*Whiting.* I will then call Mr. Child.

*Asa Child, Sworn.* I have practiced law in Baltimore. In Maryland they have books of law similar to this, which purport to be published by authority, which are read in their courts as evidence.

I did not know Jeremiah Hughes. I am not aware that this is a copy of the books thus read. I have seen similar volumes that are read in the courts of Maryland that look like this.

*By the Court.* I can not say that this volume is a copy of those commonly admitted and read in evidence in their courts.

The testimony on the part of the claimant here closed, and

*Child* moved on the facts as they stood to dismiss the prisoner.

*Jay*, in support of the motion, was stopped by the court.

*Whiting*, on behalf of the claimant, argued at length the following points:

1. That the judge had no jurisdiction to take the boy out of his master's custody. (*Prigg* v. *Commonwealth of Pennsylvania*, 16 *Peters.* *Case of Jack*, 12 & 14 *Wendell's R.* *In re Kirk*, 4 *N. Y. Legal Obs.*)

2. That in a slave state, all colored men are presumed to be slaves; and that the same presumption must be allowed here. (*Jones* v. *Van Zandt*, 2 *M'Lean*, 596; 1 *Washington's C. C. R.* 308; 2 *Wend.* 1.)

*By the Court:* EDMONDS, J., said he would not trouble the counsel for the prisoner to argue the case. There were two

In the matter of Belt.

points on which his mind was very clear, and which were deci-
sive of the question before him.

In the first place, it was necessary for the claimant to estab-
lish the fact, that the prisoner was bound to service. The
evidence was satisfactory that he had been *held* to service in
Maryland, but there was no evidence, that under the laws of
that state he was *bound* to service.

The claimant had failed to prove the laws of Maryland in
such a manner as under the rules of evidence, to permit them
to be referred to, and he could not therefore know or hold that
by those laws, slavery was tolerated in that state. It was true,
it was generally understood that it was, but upon any such
general understanding no judge could act. There must be
lawful evidence thereof, and that the claimant had failed to
give. He had, therefore, failed to establish the main point in
his case, and on which the issue has been joined, namely, that
Belt was bound to him in service.

But even if that had been sufficiently proved, there was
another reason why the prisoner was entitled to his discharge,
and that arose from the manner in which he was detained by
his master.

There was only one case in which a fugitive slave could be
held by his master, in his personal custody, in this state. That
was under the law of congress to take him without delay
before the proper authorities, in order to obtain the certificate
necessary to justify his removal out of the state. This had not
been done in this case. Instead of taking Belt before the Uni-
ted States District Judge, the claimant had removed him to a
distance. Instead of taking him there without delay, he had
detained him in his own custody for two days. Instead of
seeking a judicial determination on his claim to the boy's ser-
vices, he had withdrawn him to a distance and concealed him.
And now on his return he claims, not that he holds him under
the act of congress for the purposes contemplated in that stat-
ute, but that he holds him as his slave, because he owes him
servitude. If he can do this for two days, he can for two
years or twenty. To justify this, would warrant every slave-

holder in the nation to hold his slaves in this state as long as he pleases, notwithstanding that slavery was unknown to our laws.

As the claimant then avowed that he held the boy not in conformity to the act of congress, but in contravention of it, it was the duty of the judge to order him to be discharged from that custody.

In doing so, however, the judge said he must not be understood as attempting to decide the question, whether the boy was actually a slave, or whether his master had or had not the right to enforce his return to his service, under the laws of congress. These were questions not before him, and on them he expressed no opinion. He merely intended to decide that the boy was entitled to be discharged from his present restraint, because that restraint was not in conformity to the laws of congress, or the laws of this state.

                                        Discharge ordered

---

Supreme Court.  Erie General Term, November, 1848.  *Hoyt, Mullett* and *Marvin,* Justices.