In the Matter of the Probate of the Last Will and Testament of HENRY P. EYSAMAN, Deceased.

Where, upon the trial of an issue of fact by a surrogate, the evidence on each side is so nearly balanced that a determination either way would not be reversed upon appeal, it may not be said that the losing party is not prejudiced by material testimony of an incompetent witness, given under objection and exception, and the admission of such testimony is error requiring a reversal.

Where the probate of a will is contested on the ground of want of testamentary capacity on the part of the testator, and that the will was not duly executed, a legatee or devisee, who is not a subscribing witness, is not competent, under the Code of Civil Procedure (§ 829), to testify to personal transactions or communications with the decedent, preceding, attending or succeeding the execution of the will.

This rule excludes not only testimony of transactions directly between the witness and the deceased and communications made by the latter to the former, but of any transaction between the deceased and others, in any portion of which the witness participated, or any conversation in his hearing, although not with or addressed to him; also, any testimony as to the acts and conduct of the testator observed by the witness tending to show mental capacity.

*Cary* v. *White* (59 N. Y. 336) distinguished and questioned.

The provision of said Code (§ 2544), providing that "a person is not disqualified or excused from testifying respecting the execution of a will by a provision therein whether it is beneficial to him or otherwise," refers only to the subscribing witnesses to a will; it does not operate as a repeal by implication, so far as it relates to testimony as to the execution of a will of the prohibitory clause above referred to; nor does it authorize or permit a beneficiary under the will to testify where, under the former clause, his testimony would be excluded.

(Argued January 25, 1889; decided March 12, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, entered upon an order

made July 1, 1886, which affirmed a decree of the surrogate of the county of Herkimer, admitting to probate the will of Edward P. Eysaman, deceased.

The material facts are stated in the opinion.

*George W. Smith* for appellants.  The execution of the will is not proven by two witnesses.  (*Mitchell* v. *Mitchell*, 16 Hun, 97 ; 77 N. Y. 596 ; *Sisters of Charity* v. *Kelly*, 67 id. 409 ; *Heath* v. *Cole*, 15 Hun, 100 ; *Howland* v. *Taylor*, 53 N. Y. 627 ; *Reynolds* v. *Root*, 62 Barb. 250 ; *Willis* v. *Mott*, 36 N. Y. 486 ; 110 id. 596 ; *Neugent* v. *Neugent*, 2 Redf. 369 ; *Chaffee* v. *B. Miss. Con.*, 10 Paige, 91 ; *Remsen* v. *Brinckerhoff*, 25 W. R. 331 ; *Rutherford* v. *Rutherford*, 1 Den. 33 ; *Belding* v. *Leichhardt*, 56 N. Y. 680 ; *Lewis* v. *Lewis*, 11 id. 225 ; *In re Phillips*, 98 id. 267 ; *Baskin* v. *Baskin*, 36 id. 416 ; *Wooley* v. *Wooley*, 95 id. 235.)  Inability to remember an essential testamentary declaration in the case of a will lately executed is fatal, and the inability cannot be supplied by a false attestation clause.  (*Wilson* v. *Hetterick*, 2 Bradf. 427 ; *Rutherford* v. *Rutherford*, 1 Den. 33 ; *Seymour* v. *Van Wyck*, 6 N. Y. 120 ; *Scribner* v. *Crane*, 2 Paige, 147.)  The change effected by the will from giving a deed of one hundred acres of land for a discharge of the claims amounted to near $24,000, and was so radical and sweeping that it cannot be credited.  (*McLaughlin* v. *McDavitt*, 63 N. Y. 212 ; *Children's Aid Soc.* v. *Loveridge*, 70 id. 402 ; *Delafield* v. *Parish*, 25 id. 35 ; *Marsh* v. *Tyred*, 2 Hagg. 87, 110 ; *Blewitt* v. *Blewitt*, 4 id. 463 ; *Van Guysling* v. *Van Keuren*, 35 N. Y. 70.)  The fact that the draughtsmen of the will was the attending physician calls for close scrutiny.  (*McGuire* v. *Kerr*, 2 Bradf. 245 ; *Mowry* v. *Selber*, 2 id. 133 ; *Tyler* v. *Gardiner*, 35 N. Y. 559, 591 ; *Lake* v. *Ramsey*, 33 Barb. 49 ; *Nexson* v. *Nexson*, 2 Keyes, 229 ; *Crispell* v. *Dubois*, 4 Barb. 393 ; *In re Smith*, 95 N. Y 516.)  The testimony given by Ware of a conversation between deceased and himself was incompetent under section 829 of the Code.  (*Holcomb* v. *Holcomb*, 95 N. Y. 316 ; *Lane* v. *Lane*, Id. 494 ;

*Hatter* v. *Smith*, Id. 516 ; *Schoonmaker* v. *Wolford*, 20 Hun, 166 ; *Cadmus* v. *Oakley*, 3 Den. 324.)

*J. D. Henderson* for executors, respondents. The legal presumption is in favor of competency. Every man is supposed to be sane until he is proved otherwise. (*Colt* v. *Patchen*, 77 N. Y. 553 ; *Delafield* v. *Parish*, 25 id. 9 ; *Van Guysling* v. *Van Keuren*, 35 id. 70.) The will was properly executed. (*Baskin* v. *Baskin*, 36 N. Y. 416 ; *Jackson* v. *Jackson*, 39 id. 153.) If Barse, one of the witnesses, forgot some of the things which occurred at the time the will was executed, his failure to recollect will not defeat the probate. (*Rugg* v. *Rugg*, 83 N. Y. 592 ; *Matter of Kellum*, 52 id. 517 ; *Matter of Higgins*, 94 id. 554 ; *Brown* v. *Clark*, 77 id. 369 ; *Matter of Cottrell*, 95 id. 330.) If, on a review of the several exceptions taken by the contestants, this court should think that some of them were well taken, still the decree of the surrogate should not be reversed. (Code Civil Pro. § 2535 ; *Brick* v. *Brick*, 66 N. Y. 144 ; *In re Smith*, 95 id. 527.) It was proper to call James Ware, although a legatee under the will, to give his version of the transaction testified to by the contestant's witness, Horace Eysaman, and he was competent under section 829 of the Code. (*Marsh* v. *Brown*, 18 Hun, 319, 323 ; *Smith* v. *Cristopher*, 3 Hun, 586 ; Code, § 2544 ; *Pinney* v. *Orth*, 88 N. Y. 451 ; *Simmons* v. *Sisson*, 26 id. 277 ; *Hildebrandt* v. *Crawford*, 65 id. 107 ; *Cary* v. *White*, 59 id. 336 ; *Holcomb* v. *Holcomb*, 95 id. 325.) The allowance of costs and disbursements and the judgment of $650.50 against the contestants, was a question entirely within the discretion of the surrogate. (Code, § 2558.)

*C. J. Palmer* for James Ware, respondent. The execution of the will was proven to be in accordance with the statute. (*Lewis* v. *Lewis*, 11 N. Y. 224 ; *In re Cottrell*, 95 id. 335 ; *Orser* v. *Orser*, 24 id. 55 ; *Blake* v. *Knight*, 3 Curt. 547.) Even if Barse had forgotten, or from perversity had denied, the execution, still the question of execution would be a fact,

and the decision of the surrogate final upon the fact. (*In re Cottrell*, 95 N. Y. 329, 338 ; *In re Higgins*, 94 id. 557; Code, § 2620 ; *Brown* v. *Clark*, 77 N. Y. 369 ; *Rugg* v. *Rugg*, 88 id. 592 ; 21 Hun, 383 ; *Lewis* v. *Lewis*, 11 N. Y. 220 ; *Trustees* v. *Cahoon*, 24 id. 425.) The issues having been all decided in favor of the proponents, if there is any evidence to support the findings the appellate court will not reverse. (*In re Cottrell*, 95 N. Y. 325 ; *Gilbert* v. *Luce*, 11 Barb. 91; *Roosa* v. *Smith*, 17 Hun, 138 ; *Hewlett Case*, 103 N. Y. 156.) Upon the issue of undue influence the burden is upon the party alleging it. (*In re Martin*, 98 N. Y. 193 ; *Tyler* v. *Gardner*, 35 id. 559 ; *Delafield* v. *Parish*, 25 id. 35 ; *Coit* v. *Patchen*, 77 id. 539, 541 ; *Cowee* v. *Cornell*, 75 id. 101; *Carpenter* v. *Soule*, 88 id. 257 ; *Gorham* v. *Price*, 25 Hun, 11.) Both Sharer and Barse being disinterested, unimpeached and uncontradicted as to what took place at the execution, their uncontradicted testimony must be followed. (*Koehler* v. *Adler*, 78 N. Y. 287 ; *Robinson* v. *McManus*, 4 Lans. 380, 387; *Newton* v. *Pope*, 1 Cow. 109; *Elwood* v. *Telegraph Co.*, 45 N. Y. 553 ; *Hildebrandt* v. *Crawford*, 65 id. 107 ; 52 How. Pr. 460.) Ware's contradiction of Horace Eysaman was not objected to under section 829 of the Code ; the objection being general cannot avail here. (*Stevens* v. *Brennan*, 79 N. Y. 254; 14 W'kly Dig. 154; *In re Morgan*, 104 N. Y. 75 ; Code, § 2554; *In re Yates*, 99 N. Y. 101; *Vancouver* v. *Bliss*, 11 Ves. 458; *Thrall* v. *Chittenden*, 31 Vt. 183; *Sanders* v. *Frost*, 5 Pick. [Mass.] 260 ; *Spencer* v. *Spencer*, 11 Paige, 299 ; *Rundle* v. *Allison*, 34 N. Y. 180.) It was proper for Dr. Sharer to steady Eysaman's hand at his request, or to write the subcription. (*Campbell* v. *Logan*, 2 Brad. 95 ; Redfield on Sur. 159 ; Revised Statutes [7th ed.] 2286.) The testimony not only shows the writing by deceased, but an acknowledgment that the subscription is his. The acknowledgment alone is sufficient if it appears he saw and knew it. (*Hoysradt* v. *Kingman*, 22 N. Y. 372; *Baskin* v. *Baskin*, 36 id. 416.) As Ware did not engage in

the conversation at the declaration of the will, but testified to what he heard under objection, he was competent to speak. (*Hildebrandt* v. *Crawford*, 65 N. Y. 107; 6 Lans. 502; *Patterson* v. *Copeland*, 54 How. Pr. 460; Code, §§ 2513, 2545, 2559; *In re Brown*, 65 How. Pr. 464.)

RUGER, Ch. J. The probate of the will of Henry P. Eysaman was contested before the surrogate by some of his heirs and next of kin, upon the ground of undue influence, the want of a sound disposing mind and memory, and the absence of sufficient proof of due execution by the testator. The main question now presented is, whether James Ware, the principal legatee, was competent to testify to the transactions preceding, attending and succeeding the execution of the will, and, if not, whether his evidence on those subjects necessarily prejudiced the contestants in the controversy before the surrogate. The allegation of undue influence was not supported by sufficient evidence to authorize us to review the finding of the surrogate upon that question, and the inquiries must now be addressed to the questions of due execution and the existence of testamentary capacity at the time of its execution, as affected by the evidence of Ware. The decree of the surrogate admitted the will to probate, and his decision was affirmed, on appeal, by a divided court. The will purported to have been executed on Sunday, April 27, 1884, and the testator died on Thursday, four days thereafter, of uræmia, or blood poisoning, at the age of seventy-eight years. The material evidence, bearing upon the questions of mental and physical condition, related mainly to the period of one week preceding the testator's death. The evidence showed that the testator was afflicted with gravel or retention of urine, and had been in failing health for about two months before his death, being much of the time confined to his bed, and during the last week of his life wholly so. Up to Saturday, the evidence shows that he was, although feeble, apparently conscious, talking occasionally with visitors and attendants, and able to transact some business and to give

orders concerning the management of his ordinary affairs. On Saturday, after engaging in two transactions, he claimed to be too much exhausted to do any more that day. Thereafter, he undertook no business transaction except that of the execution of his will, and his physical condition seems to have become weaker. He talked but little, if at all, and gradually declined until he died. His physician testified that, on Monday, he observed symptoms of the suppression of urine, which became quite pronounced on Tuesday, and were accompanied by drowsiness and coma, which generally prove fatal in from two to five days after such symptoms appear. Others testified that some of these symptoms were observable on Sunday. No witnesses, except Sharer and Ware, testify that after Saturday night he engaged in any rational conversation, beyond occasional calls for nourishment or attempts to utter some name. The conversation attending the publication of the will was testified to by Sharer and Ware alone, and their version was much impaired, if not contradicted, by Barse, the only other person who was present at the time. Many persons saw him between Saturday and the day of his death, but none of them testify to any material conversation had by him, except Sharer and Ware, although other persons were present at most of the occasions described by them.

The conversation taking place at the time of the execution of the will, as testified to by Sharer, who drew it, consisted almost wholly of alleged answers made to questions put to him by Sharer, and was substantially as follows: "I handed the will to him on Sunday morning and left the room; he soon sent for me and handed me the will and said 'it is all right;' he said he would sign it; he was in bed when he signed it; wrote upon a book; Mr. Barse then signed as one of the witnesses; Mr. Ware and myself were in the room when Barse came in; he said good morning to Mr. Eysaman and Mr. Eysaman said good morning 'Irve;' I said to Mr. Eysaman, is this your last will and testament, and he said it was 'his last will and testament;' I then asked, do you want Mr. Barse and

myself to witness the will in your presence and in the presence of us, and he said he did; I told Mr. Barse I had signed my name before he came; Mr. Barse signed." Repeating the conversation, he further testified, "I asked if he wanted Mr. Barse to witness his will, he said he did; then I asked him if that was his last will and testament, and he said it was; and then I asked him if it was his signature, and he said it was, or if he wrote it, and he said he did; I asked him if he wanted Mr. Barse and me to witness the will in his presence and he said he did.  *  *  *  When the old gentleman signed the will he was sitting up in bed; he asked to be helped; asked Mr. Ware; I had hold of his hand when he wrote; I guided his hand; he was trembling; my fingers were on his wrist; he asked me to do it; the will was read to him fifteen or twenty minutes before the signing; he said it was all right; he said he was glad he had signed it; he was glad it was all over now;  *  *  *  Mr. Ware held him up; stood by the side of the bed with his arms around his back; I think he used his left arm; the will that time was lying on a book; I held the book by either the right or left arm;  *  *  *  I had hold of his wrist, back of the bone of his thumb · I steadied his hand."

Mr. Barse, the other attesting witness, testified, substantially, as follows:

" Q. Mr. Eysaman didn't tell you this was his last will and testament ?   A. No, sir.   Q. And he didn't ask you to sign it as a witness ?   A. Not in words.   Q. Did Mr. Eysaman ask you to sign his will at all, as a witness, in words ?   A. No, sir.   Q. Did Mr. Eysaman say to you at all that he had signed this will ?   A. No, sir.   Q. Did he acknowledge to you in words that it was his signature to the will, or did he say in words to you that it was his signature to the will ?   A. No, sir.   Q. Did you hear any conversation at all that you can now recollect — any conversation or words used by Mr. Eysaman on that occasion that you can now recollect ?   A. No, sir.  *  *  *  Q. You saw no other sign of attention than by the nodding of the head ?   A. No, sir.   Q. Did he nod his head more than

once? A. I don't know. Q. You have no impression about any nodding of the head more than once? A. No, sir; I think he nodded his head; no other movement that I recollect, by turning his head or opening his eyes; I think he did utter my name 'Irve'; don't recollect any other words; when Dr. Sharer spoke I do not recollect any movement of the face or head; I think he made movement of his head as if giving attention; nothing more than nodding."

Another witness, who attended the testator during the day and night of Sunday, states that he entered the room in the morning directly after Dr. Sharer left, and that he asked the testator "how he felt this morning," and he made no reply; "he was in a drowse when I went in, lying right upon his back; I think his eyes were shut." Sunday, towards evening, Dr. Sharer came there with Mr. Petrie; Dr. Sharer spoke to the old gentleman; he asked him if he knew Mr. Petrie; Mr. Eysaman made no reply to it. "Q. Anything else said to him during that afternoon or evening, that you heard or saw by anyone? A. I don't remember anything; Mr. Eysaman, most of that afternoon, was in a drowse; he would wake up once in a while from his sleep and go right in a drowse again; I did not hear him say anything at all that day; * * * during Sunday I did not hear him say anything to anybody; I don't know whether he saw anything or not, of course; he did not move his head to notice anybody; there was a person come up to the bed and he took no notice of them. I think he did not, by any act or word, indicate that he realized any person that was present. I noticed his breathing heavily all along for a number of days; from the time I was there with him; Sunday night he did not say a word or make a motion to call for anything himself; his condition, Monday, was the same, except he was a little weaker; I didn't hear him talk any on Monday; from that time to the time he died he made no reply when I spoke to him; more than a mere nod of the head; what I asked him was, if he wanted some water or something to wet his mouth; I occasionally asked him if he wanted a drink or something of that kind; I got no reply, not a word from that time on

Sunday; I did not hear him say anything that you could understand; he died Thursday at three o'clock; from Sunday to that time I don't remember that he had any conversation."

The evidence of a number of experts was given on the part of the contestants, to the effect that the signature of the will was not in the handwriting of the testator, but was apparently that of Sharer, and the surrogate, in his opinion, states that "the appearance of his signature to the alleged will, I think indicates that he was aided in its formation." An examination of the will which was presented to the court on the argument, considered in connection with the evidence of the experts, shows that the capital letters in the signature bore a resemblance to the character of Sharer's handwriting, and did not conform to the manner in which the testator usually formed such letters. Some discrepancies also appeared in the evidence of Sharer, and several witnesses testified to declarations made by him which were more or less inconsistent with his testimony on the trial. It seems to us, upon the whole evidence, to be indisputable that the testator was, at the time of the execution of the will, in the borderland between consciousness and insensibility. Although we have not alluded to all of the circumstances bearing upon the issue tried, we have endeavored to present its salient features with a view of showing the bearing which the evidence of Ware had upon the question presented. The probate of the will was affirmed at General Term upon the ground, among others, that the evidence of Ware, even if erroneously admitted, did not necessarily prejudice the contestants. We are unable to concur in the opinion of the majority of that court upon this question, and think that upon the evidence a serious question of fact was presented to the surrogate, as to the existence of testamentary capacity on the part of the testator on Sunday morning when the will was executed, and whether there was a conscious and intelligent understanding by him of the circumstances attending its execution. It cannot properly be said that material evidence erroneously admitted upon an issue is harmless, unless the testimony preponderates so greatly in favor of the proposition that

a verdict against it would be set aside by the court as contrary to the evidence. When the evidence on each side is so nearly balanced that a determination either way would not be reversed upon appeal, it cannot be said that the losing party is not prejudiced by material evidence testified to by an incompetent witness against his objection. We think the testimony in this case, excluding that of Ware, was so nearly balanced that a decree in favor of either party could not properly have been reversed upon the facts by an appellate tribunal.

Under these circumstances Ware, who was the principal devisee under the will and had been in the testator's employ for upwards of forty years and his constant attendant during his last sickness, was called as a witness in support of the will. He was permitted to testify to his observations of the acts, conduct and conversations of the testator during the last week of the testator's sickness. This evidence was uniformly objected to, except in one instance, by the contestants, upon the specific ground that Ware, as a legatee under the will, was not competent to testify to personal communications and transactions with the testator, under section 829 of the Code. These objections were uniformly overruled by the surrogate, and Ware gave abundant evidence upon the subject of the testator's mental and physical condition during the last week of his life. Among other things, he was permitted to testify, under objection, to a conversation occurring between himself and the testator, on Saturday, the twenty-sixth of April, in relation to the subject of an offer by the testator to execute a deed of a certain one hundred acres of land to the witness, which was declined by him. The conceded error in admitting this evidence was disregarded by the General Term, upon the ground that the objection thereto was not sufficiently specific. The objection immediately succeeded eight previous objections to similar evidence, made upon the ground that the witness was not competent to testify to such transactions and conversations, and that it was "incompetent and immaterial." We think the admission of this evidence

was error, and that the trial court was sufficiently apprised of the real nature of the objection by the whole course of the examination of the witness. (*Church* v. *Howard*, 79 N. Y. 415.) This witness was further permitted to testify to his observations of the testator's acts, conduct and conversations during the four days succeeding the Saturday in question. Excluding, for the present, his evidence on the subject of the execution of the will, he testified, under objection, to eleven different conversations had by the testator with various persons, indicating capacity to converse intelligently and understandingly upon the subject introduced; a recognition of the various persons who visited him; appreciation and intelligent answers to all questions put to him; a consciousness of his physical wants and the ability, in language, to make them known; and, generally, to a sufficient degree of consciousness, intelligence and judgment to show that when he executed his will he did so with full knowledge and appreciation of the nature and effect of the transaction in which he was engaged.

It is quite impossible to say that this evidence did not have a powerful effect upon the determination of the question of testamentary capacity presented to the surrogate for decision. This evidence was offered and received as bearing upon the condition of the body and mind of the testator, without reference to the particular signification of the language used by him, and was important only as showing the mental capacity of the testator and whether he had an intelligent understanding and appreciation of what took place within his sight and hearing at the time of the execution of the will. The issue in the case was whether the testator was conscious and of sound disposing mind on the Sunday in question, and Ware's evidence consisted of his observations of the acts, conduct and conversations of the testator as exhibited to those who were attending him. Such evidence was important and material upon the issue tried and is clearly within the letter and spirit of those transactions to which the Code prohibits an interested witness from testifying. It was of the same class of evidence as that pronounced by this court to be

incompetent under section 829 of the Code in *Holcomb* v. *Holcomb* (95 N. Y. 316); *Lane* v. *Lane* (Id. 494); *In re Smith* (Id. 516).

As indicated by the head-note of *Holcomb* v. *Holcomb*, it was there held that " the policy of the statute excludes testimony of an interested witness concerning any transaction with the deceased in which the witness in any manner participated, or of any communication in his presence or hearing, if he, in any way was a party thereto," and that testimony of interested witnesses was improperly received " as to conduct and actions of the deceased, tending to show his enfeebled and dependent condition, and as to statements made by him although not addressed to the witness, and made in ignorance of his presence."

The case of *Cary* v. *White* (59 N. Y. 336) is not an authority for the admission of this evidence. Several grounds for the conclusion reached in that case were stated, but a single judge only concurred with the opinion; two judges concurred in the result and two dissented, the remaining judge not voting. One of the grounds suggested in that case was that the party objecting to the evidence offered, was not an assignee of the deceased person within the meaning of the statute. The evidence there sought to be given consisted of a declaration made by the deceased person to his own attorney in the presence of the plaintiff. The point was presented upon an objection to the question calling for the evidence which was sustained by the trial court. The judge who wrote in this court was of the opinion that the question excluded did not necessarily relate to a personal communication or transaction between the deceased person and the witness, and was, therefore, competent. The case cannot be considered an authority upon the question here presented.

Ware was also permitted to testify, under objection, to the conversation taking place between the testator and Sharer and Barse attending the attestation and publication of the will. His evidence tended, in every material respect, to corroborate

the version given of the transaction by Sharer, and conflicted with that of Barse. At the time this evidence was admitted it appeared that Ware had been present during the whole interview, during which the will was alleged to have been executed, and had, confessedly, taken a part in its subscription by the testator. Ware and Sharer were the only persons then present, and Ware supported the testator upon the bed in his arms by the testator's express request, while Sharer guided the hand, upon similar request, and assisted Eysaman in subscribing his name to the will. It cannot be doubted that the request to Ware, and acquiescence and participation in the act of the testator in subscribing the will, was a personal transaction and communication between him and the testator within the meaning of the statute. Such must have been the understanding of the proponents, for they voluntarily omitted to examine Ware in chief as to the signing of the will, but confined his evidence to the publication and attestation which followed the testator's subscription. This was claimed by them to be competent as relating to another transaction in which he took no part.

We think it was error to admit this evidence. The act of executing the will, although consisting of several incidents, constituted but one transaction, and derived its efficacy as a valid execution from the performance of each requirement of the statute. The transaction was continuing and related to but one subject, viz., the execution of a will. A participation by a person in any of the material acts required to complete its valid execution made the transaction one between the testator and that person. Ware was present from the subscription to the publication and attestation, and it cannot reasonably be held that he did not participate in the execution of the will.

We are referred by the respondents to section 2544 of the Code of Civil Procedure, providing that " a person is not disqualified or excused from testifying *respecting the execution of a will* by a provision therein, whether it is beneficial to him or otherwise," as bearing upon the question of the competency of the evidence given by Ware. No argument or

discussion accompanied this reference, and we are left to con-
jecture what bearing it is supposed to have upon the facts of
the case.   We infer that it is thought to have effected, to some
extent, a repeal of section 829 by implication, and some of my
brethren are of the opinion that the point is sufficiently grave
to require serious treatment.   The section occurs in that part
of the Code relating exclusively to proceedings in Surrogates'
Courts, and states, in respect to a single subject, that a person
shall not, by reason of an interest under a will, whether benefi-
cial or otherwise, be disqualified from testifying to its execution.
We think this section was intended to be restricted to sub-
scribing witnesses alone.

The persons whose testimony is competent, and, by statute,
indispensable to the probate of a will, are its subscribing wit-
nesses, and they are, according to general understanding, the
persons who are known as witnesses to its execution.   To
hold, therefore, that the section refers only to those persons
who are generally understood to be the witnesses to a will,
would accord with its language, and, we think, also with its
obvious meaning and intent.   Repeals by implication are not
favored by the courts and will not be allowed, unless there is
such a repugnance between two statutes that they cannot
stand together and one necessarily nullifies the other.   If
such a construction, however, can be given to them that both
may stand and each have an appropriate office to perform, then
it is the duty of the court to so interpret them.   We think
that section 2544 refers to subscribing witnesses alone, and was
intended to make all such witnesses competent to testify in a
probate court to its execution, however their interest might
arise.   Although the express words do not so confine it, we
think such a purpose can fairly be implied from its language
and that of statutes *in pari materia*.   It is said in the note
to the section, in Throop's edition of the Code of Civil Pro-
cedure, that it was substituted for section 6, and a part of section
50 of part 2, chapter 6, title 1 of the Revised Statutes.   Those
sections were, substantially, as follows : Section 6 provided that
a creditor being a subscribing witness whose debt is by the will

made a charge upon lands devised, should, notwithstanding such interest, be a competent witness to prove the will. Section 50 provided that: "If any person shall be a subscribing witness to the execution of any will, wherein any beneficial devise, legacy, interest, or appointment of any real or personal estate shall be made to such witness, and such will cannot be proved without the testimony of such witness, the said devise, legacy, interest or appointment shall be void so far only as concerns such witness, or any claiming under him; and such person shall be a competent witness, and compellable to testify respecting the execution of the said will in like manner as if no such devise or bequest had been made." Section 51, referring to the same subject, provided that, in case such witness would have been entitled, as heir or next of kin, to a share in the estate of such testator if he had died intestate, that he might recover from the devisees and legatees in the will, if established, his proportion of such estate, not exceeding, however, the amount devised to him by the will. Section 6 of the Revised Statutes was expressly repealed by chapter 245 of the Laws of 1880, and thereby rendered all interested witnesses, save those mentioned in section 50, which was expressly excepted from the repeal, incompetent to testify as subscribing witnesses. Section 2544 was, therefore, adopted as a substitute for section 6, and was intended to enlarge the former exception and embrace not only the special case provided for by the repealed section, but all other possible cases where an interest in the event of a controversy over the probate of a will, might, under the existing statute, disqualify a subscribing witness from testifying to its execution. Although it may not be easy to specify such cases the legislature, probably out of abundant caution, deemed it prudent by general words to embrace all subscribing witnesses by a comprehensive exception from disqualification by reason of interest. The language of the enactment seems to support this view. The evidence authorized to be given by section 2544 refers to that given in Surrogates' Courts alone, and relates solely to the subject of the execution of the will. It was clearly intended

to operate as a substitute for prior statutes that related to subscribing witnesses alone, and there was no reason for including other persons in its provisions.   The reason for exempting such witnesses from the application of the general rule of exclusion, made by section 829 is obvious, as their testimony is made indispensable, if obtainable, to the probate of a will. (§§ 2618, 2619.)   Otherwise numerous wills to which legatees and others interested, who had, through ignorance, carelessness or inadvertence become attesting witnesses, would fail in their probate and the wishes of their makers in respect to the disposition of their property be altogether defeated.   To obviate these consequences the provisions of the various statutes referred to were adopted.   To carry the effect of section 2544 beyond the object alluded to would make interested witnesses competent to testify to facts no more essential to the establishment of wills than many other transactions respecting which they are obviously, under section 829, incompetent now to testify. Such witnesses are now incompetent to speak of personal communications and transactions with a testator, showing undue influence or testamentary capacity, and why should it be deemed important to make them competent to prove the execution of a will, which is generally supposed to be effectively taken care of by the subscribing witnesses, and yet deprive them of competency upon other equally important facts in such a controversy.   It might also be asked why legatees who are subscribing witnesses should be compelled to forfeit their legacies if called to prove a will, and that those who are also legatees but not such witnesses, can testify to the same facts with perfect immunity from loss by reason thereof? And it may further be asked why such person should be permitted to testify to the execution of wills before a surrogate and yet be precluded from doing so in controversies in other courts concerning the validity of testamentary dispositions? It is quite apparent that section 2544 has not been supposed by either the bench or the bar of the state, to have produced any change in section 829; for during the nine years since its adoption, it has not been cited or referred to in

any case that we have discovered, where section 829 has been the subject of consideration. In the meanwhile numerous decisions have been erroneously made in the courts of the state if section 2544 is now given the effect claimed for it. We refer to a few only of the cases which have been decided in this court.

In *Lane* v. *Lane* (95 N. Y. 494), the evidence of the testator's wife, who was a legatee under the will, was admitted to prove the conversations taking place at its preparation and execution. This court said, " as to any personal transaction or communication with the testator, she was, of course, incompetent to testify under section 829 of the Code," and the judgment was reversed for error in the admission of her evidence.

In the same volume (p. 516) in the *Matter of the Probate of the Will of Smith*, a legatee and executor of the will was permitted to testify to the instructions of the testator and the draft and execution of a will on September tenth, with a view of showing that a subsequent will, executed on September thirteenth, was a transcript of the previous will and in all respects the same, except that the witness was a subscribing witness to the first will and not to the last. It was held that such witness was not competent to testify under section 829.

In the *Matter of the Will of Wilson* (103 N. Y. 374) an executor and legatee under the will of Wilson was allowed to testify to facts relating to the preparation and execution of the will. It was held that the witness, having previously executed a release of his legacy to the executor, was thereby rendered competent, although, otherwise, he would have been incompetent under section 829.

In *Loder* v. *Whelpley* (111 N. Y. 239), it was stated that, " the testimony of a legatee under a will, so far as it relates to communications with the testator, or transactions with him, is inadmissible on proceedings taken for the admission of the will to probate under Code of Civil Procedure (§ 829)." It may also be observed that Ware's evidence was not offered for the purpose of proving the execution of the will, for the surrogate had already ruled that the formal proofs of execu-

tion were sufficient to admit the will to probate, and it was, therefore, received upon the question of testamentary capacity, and was, unquestionably, important evidence upon that issue. As we have seen, his evidence upon that question, if derived from personal transactions and communications with the testator, was incompetent, and, upon such an issue, it was none the less so because it related to observations made during the proceedings for the publication of the will.

The history of sections 828 and 829 shows a uniform, consistent and intelligent purpose on the part of the legislature, while abolishing the strict rules of the common law in relation to testimony given by interested persons, to so limit and restrict such evidence as not to permit them to speak of personal transactions and communications had with a deceased person through whom the respective parties to the litigation derived the title or interest which was its subject. The general principle that interest in the event of an action should not disqualify a person from testifying therein was incorporated in section 398 of the original Code of Procedure adopted in 1848. It was thereby provided that "no person offered as a witness shall be excluded by reason of his interest in the event of the action." By section 399, however, it was provided that the previous section should not apply to a party to the action, nor to any person for whose immediate benefit it should be prosecuted or defended; neither should an assignor of a thing in action or contract be examined in behalf of a person deriving title through or from him against an assignee or an executor or administrator, unless the other party to such contract or thing in action should be living.

By an amendment to the Code, in 1857, the restriction as to parties to an action and persons for whose immediate benefit it was prosecuted or defended was removed in cases where the adverse party was living and was capable of being examined as to the same transaction. Under these provisions it had been held that they did not apply to special proceedings or probate cases. (*In re Belt*, 1 Park. Crim. Rep. 169; *Woodruff* v. *Cox*, 2 Brad. Surrogate Rep. 223.) But by

section 12, chapter 459 of the Laws of 1860, it was provided that sections 398 and 399 should apply to Surrogates' Courts, and that the interested parties thereby made competent should not testify to personal transactions had with a deceased person under certain circumstances therein specified. By section 31, chapter 460, Laws of 1862, sections 398 and 399 of the Code of Procedure were not only again made applicable to Surrogates' Courts, but such parties as were thereby made competent as witnesses were prohibited from testifying to personal transactions or communications with a deceased person as against the executors, administrators, heirs-at-law, next of kin or assignees of such deceased person. Since 1862, therefore, through all of the mutations which sections 398 and 399 have undergone, until they became, in 1877, sections 828 and 829 of the present Code of Civil Procedure, the prohibition upon interested parties, in actions as well as surrogates' proceedings, from testifying to personal communications and transactions with a testator, have been carefully re-enacted and preserved. It can hardly be supposed that these sections which have been the subject of frequent consideration and amendment by the legislature, and of the fullest and most careful scrutiny and consideration by the courts, should have been intended to be amended in so important a particular as that contended for, without any reference to it in the section, or some provision making it applicable to other than probate cases involving the validity of wills, and where the want of such evidence might be conclusive of the controversy. Indeed, we do not see why the same rule of construction would not require us to hold that section 399 of the original Code operated to repeal section 50 of the Revised Statutes, for certainly that section prohibited all interested persons from testifying to personal communications and transactions with a deceased person; and the general language of that section would apply as well to subscribing witnesses as to persons not in that situation; yet it was never, we think, supposed to have that effect, and section 50 still remains as an existing provision of law prescribing the conditions upon

which legatees and others who are attesting witnesses, shall testify in respect to the execution of wills. It seems to us it could not have been intended that these legatees should be compelled to forfeit their legacies to render them competent to testify to the execution of a will, while others who were equally interested could testify to it without losing their interests thereunder.

We are, for the reasons stated, of the opinion that the judgment of the General Term and decree of the surrogate should be reversed, and the proceedings remanded for the further action of the surrogate therein, with the question of costs reserved for the determination of the court below, upon the final disposition of the case.

All concur except EARL, J., who takes no part.

Judgment accordingly.