CANADIAN INDUSTRIAL ALCOHOL COMPANY, LTD., a corporation organized and existing under the laws of the Dominion of Canada, Plaintiff in Error, *v.* JAMES R NELSON and JOSEPH ERNEST RICHARDS, Defendants in Error.

(*July* 28, 1936.)

WOLCOTT, Chancellor, LAYTON, C. J., HARRINGTON, RODNEY and SPEAKMAN, J. J., sitting.

*Caleb S. Layton* (of Richards, Layton and Finger) for Plaintiff in Error.

*Hugh M. Morris, Ivan Culbertson, Edwin D. Steel, Jr.,* and *S. Samuel Arsht* (all of the office of Hugh M. Morris) for Defendants in Error. *Maurice Bower Saul* and *Earl G.*

*Harrison* (of Saul, Ewing, Remick and Saul, of Philadelphia), and *George M. Clarke* (of Clarke and Allen, of New York), of counsel.

Supreme Court, No. 2, October Term, 1935.

Writ of Error from a judgment entered by the Superior Court for New Castle County on the verdict of a special jury.

This case involved an action of assumpsit by James R. Nelson and Joseph Ernest Richards, the plaintiffs below, for the recovery of a commission alleged to be due them from the Canadian Industrial Alcohol Company, Ltd., the defendant below, for procuring, at the request of that corporation, a purchaser for a large quantity of whiskey belonging to it and stored in Canada.

Nelson and Richards in the court below declared on the common counts, including work and labor done, at the request of the defendant company; and the amended bill of particulars attached thereto was as follows:

"Canadian Industrial Alcohol
Company, Ltd.
to
"James R. Nelson and Joseph Ernest Richards.

"June 1st, 1934. To services rendered August 24th, 1933, to November 15th, 1933, in procuring and in connection with negotiations between Canadian Industrial Alcohol Company, Ltd. and National Distillers Products Corporation, for the sale and marketing of 8,000,000 gallons of whiskey belonging to Canadian Industrial Alcohol Company, Ltd. and of a value of $50,000,000, and in procuring the sale or marketing of said 8,000,000 gallons of whiskey, $5,000,000."

The defendant company, among other things, pleaded non assumpsit. The facts pertaining to the controversy were, in substance, as follows:

In 1932 the Canadian Industrial Alcohol Company, a Canadian corporation, engaged in the manufacture and sale of whiskey, owned and had stored in that country, approxi-

mately 8,000,000 gallons of certain types of rye whiskey. National Distillers Products Corporation, of which Mr. Seton Porter was the president, and Daniel K. Wieskopf was a Vice-President, was, also, a large American company engaged in the same business.

Some time in the middle of the year 1933, one Louis V. Wright, who represented the Canadian Industrial Alcohol Company, the defendant below, approached Mr. Wieskopf with a proposal relating to the marketing in the United States, for medicinal purposes, of the whiskey belonging to the Canadian company.

In April, of 1933, Mr. Wright, acting for the Canadian company, the defendant below, again saw Mr. Wieskopf about the same matter at the office of the National Distillers Products Corporation in New York. At that time, Mr. Wright, also, saw Mr. Seton Porter, the president of the National Distillers Products Corporation, and Mr. Schwartzhaupt, another Vice-President of that corporation; and at that time they tentatively discussed the formation of an American corporation to market and distribute the whiskey which had been manufactured by the Canadian Industrial Alcohol Company, Ltd., and which was then in storage in Canada. Under the plan discussed, the stock of this new corporation, if formed, was to be held in equal proportions by the National Distillers Products Corporation and by the Canadian Industrial Alcohol Company.

No definite agreement about that matter was, however, made at that time as the eighteenth amendment to the Constitution of the United States had not then been repealed; but there was evidence in the record that would seem to sustain the contention that the plan tentatively considered had not been entirely abandoned in case it should be repealed, and, in fact, active negotiations for the sale of the

whiskey still continued between the two companies through and beyond the summer of 1933.

Lord Shaughnessy, of Montreal, Canada, was president of the Canadian Industrial Alcohol Company, Ltd. He was, also, president of "Sir Mortimer Davis, Inc.," a Canadian corporation that owned a majority of the stock of the Canadian Industrial Alcohol Company, and together with Lady Davis, afterwards Mrs. Loder, was an executor of the Estate of Sir Mortimer Davis. Nelson, one of the plaintiffs in the court below, lived in New York, but had at one time lived in Montreal; he had been the secretary of the elder Lord Shaughnessy, who was then president of the Canadian Pacific Railroad Company, and had known the present Lord Shaughnessy many years. He testified that he was a financial agent or broker engaged in raising money for corporations, and that the present Lord Shaughnessy, who was a lawyer, knew that and, in fact, on one occasion had represented him in a brokerage transaction.

Richards, the other plaintiff, also, lived in New York, and testified that he was a private broker engaged in various kinds of business and financing.

In the early summer of 1933, Nelson claimed that he had been informed by some friends in New York that the Canadian Industrial Alcohol Company had a huge quantity of American type Rye Whiskey for sale. Knowing that Lord Shaughnessy was the president of that company, claiming to act for one Higgins and one Murphy, he then wrote him from New York, on June 27th, 1933:

"I have a group here who are prepared to purchase for cash bonded warehouse receipts covering rye and bourbon whiskies now in bond. My friends understand this whiskey to be over 7 years old and to amount in quantity to over 8,000,000 gallons.

"Will you please quote prices and let me know if I am covered on any commission. The transaction could be handled through the Canadian Bank of Commerce here.

"Another plan that could also be worked would be to sell direct

to a corporation owned by this group which would furnish a certified copy of their U. S. Government Permit and legal withdrawals, and this company of theirs I would be interested in. They would want to make a contract to purchase all of your supply over a period of a year, with deliveries of a proportionate amount monthly.

"I will be grateful if you will *wire me* if you are interested, and write me giving prices. * * *"

In reply to this letter, Lord Shaughnessy wired Nelson on June 29th, 1933, from Montreal,

"Not anxious now quote prices but any proposition from substantial people will be carefully considered."

On July 5th, 1933, Nelson again wrote Lord Shaughnessy from New York:

"Your telegram of June 29th was received in due course, and I am grateful for the prompt attention given to my letter.

"The group, at whose instance I wrote, are prominent Democrats with ample capital, and I expect to communicate with you again, or visit there to see you in person, as soon as their plans are complete. Meantime, if quite consistent, I would like to know for my own information, approximately the quantity of whiskey, over seven years old, which is available. * * *"

Both of these letters were addressed to "Rt. Hon. Shaughnessy, Consolidated Distillers Corporation, Canada Cement Building, Montreal, Canada." That corporation was the selling agency of the product of the Canadian Industrial Alcohol Company, the defendant below.

Shortly after the last letter, Nelson claimed that he met Lord Shaughnessy at a New York hotel. At that meeting, Shaughnessy was reluctant about giving any information as to the age and gallonage of the whiskey belonging to his company, but finally said that he would hate to see it sold for less than $6.00 per gallon.

On August 11th, 1933, Nelson, together with Mr. Higgins, went to Montreal and saw Lord Shaughnessy. Higgins said that he would like to arrange to purchase the entire quantity of American type whiskey over a period of time. Shaughnessy said that he was prepared to entertain

any offer from substantial people as he had said to Nelson in his telegram. Higgins then offered $4.50 per gallon, and Lord Shaughnessy remarked that that was the first decent offer that he had received and that if Mr. Higgins would satisfy him as to his ability to finance such a purchase he would submit it to his people for their consideration. The Higgins' transaction never materialized because he was unable to satisfy Lord Shaughnessy as to his financial responsibility.

Some other representations as to possible American purchasers were, also, made by Nelson to Lord Shaughnessy, but he ascertained from private sources that the parties named were not interested.

While in Lord Shaughnessy's house in Montreal, and after the discussion about the proposed Higgins' transaction had been completed, Nelson testified that he told Lord Shaughnessy that he had "presented" to Mr. Richards, the other plaintiff, "the business of buying—rather of selling on behalf of the Canadian Industrial Alcohol Company, Ltd., the whiskey or the control of the company belonging to the Mortimer Davis Estate," and asked him whether, in the event of a purchase of the shares by any associates of Mr. Richards, he would be willing to pay the cost of listing those shares on the New York Stock Exchange. Lord Shaughnessy replied that he would, and Nelson claimed that he telegraphed Richards to that effect. He, also, claimed that he told Lord Shaughnessy who Richards was and whom he understood his friends and associates were, and that he thought "he was a likely person to find a purchaser for either the whiskey or the shares of stock." He further stated that Lord Shaughnessy was extremely anxious to sell either the whiskey or the controlling interest of the Davis corporation in the Canadian Industrial Alcohol Company, and so expressed himself on various occasions.

On August 22nd, 1933, Nelson wrote Lord Shaughnessy from New York:

"I am enclosing a letter from Mr. J. Ernest Richards. His references, in case such are considered necessary, are Mr. Harvey D. Gibson, President, Manufacturers Trust Company, 55 Broad Street, this City.

"I hope that you can comply with this request of Mr. Richards, in which event I would suggest that your letter be addressed to him direct, and a copy sent to me at 24 East 62nd Street.

"It would be a good idea, immediately upon receipt of this letter, to send me a telegram stating that this request will be complied with, and letter to Mr. Richards to confirm will follow.

"I look forward with pleasure to your telephone call tomorrow— Wednesday   *   *   *."

This letter enclosed a letter from Richards to Nelson, also dated August 22nd, 1933:

"Referring to our several conversations in connection with the Canadian Industrial Alcohol Company stock, upon investigation I have been told that certain representations have been made to the effect that there are negotiations in progress for the purchase of the merchandise of the above mentioned company.

"Inasmuch as I have thoroughly responsible people considering making a bid for the outright purchase of the entire holdings of the Estate of Sir Mortimer Davis which, I understand, represents control, it will be necessary for me to have a definite statement from those in control of the sale of the stock, to the effect that no sale of the merchandise, outside of the ordinary small sales, will be considered or consummated between now and September 1st, 1933.

"It is obvious that my people cannot arrive at an intelligent figure without knowing the investory would remain stationary.

"Will you please obtain from Lord Shaughnessy, as soon as possible, the assurances required above, in order to facilitate my negotiations.   *   *   *"

As already stated, Nelson claimed that he and Lord Shaughnessy had previously discussed the question of selling the stock of the Sir Mortimer Davis Company, and that he was willing to sell either that stock or the whiskey of the Canadian Company.

By telegram of August 24th, 1933, addressed to Lord Shaughnessy at the Canadian Industrial Alcohol Company offices, Nelson arranged to take Richards to Montreal to

meet and talk with him. At that meeting, according to his testimony, Richards stated that he did not want to look for a purchaser of either the whiskey or the stock unless he knew that he would be "the exclusive agent for this whiskey or shares."

Nelson, also, said that his "recollection" was that Lord Shaughnessy said "go ahead and find me a buyer if you can." He, also, said that the price of the whiskey would be in the neighborhood of $6.00 per imperial gallon, and the shares would cost in the neighborhood of $26.00.

Pursuant to the request of Nelson, Lord Shaughnessy went to New York on October 3rd, and met Nelson and Richards, and Richards told him that he intended to take him to see Mr. Seton Porter, President of the National Distillers Products Corporation. Nelson was not present at this meeting but he saw Lord Shaughnessy a few hours later and claimed that he then said, "Jim, I am delighted to have met substantial people now through Richards with whom I think we can consummate a deal." Later, on the same day, when Richards was, also, present, Lord Shaughnessy then asked him to elaborate upon the plan that Mr. Porter had proposed for acquiring the stock of whiskey of the Canadian Industrial Alcohol Company, and Mr. Richards tried to do this on paper.

Nelson, also, claimed that later in the same evening he walked with Lord Shaughnessy from the club where they had dined most of the way to the Waldorf-Astoria Hotel, and that Lord Shaughnessy said to him "Now Jim, don't worry about this business. There is no feature of it that can't be ironed out and your commission will be paid."

On November 3rd, 1933, Lord Shaughnessy again came to New York. He then told Richards that they seemed to be up against a stone wall with Mr. Porter as to the price of his whiskey. There was a meeting at that time between

Lord Shaughnessy and Lady Davis, and Mr. Porter and others, but neither Richards nor Nelson was present.

That evening Nelson saw Lord Shaughnessy in Richards' apartment, and was told by him how successful his negotiations with Porter had been. He, also, told him that they had agreed on a price of $4.38 per (American) gallon, and were to divide the profits in excess of that on an equal basis. According to Nelson, he, also, said "Jim, this will make you and Ernest independent for life." A day or so later Nelson claimed that Lord Shaughnessy, also, said that he was so well satisfied with the result of their efforts in securing Porter for him, as a purchaser, for his whiskey, that he figured on making them financially independent for life.

Nelson did not see Lord Shaughnessy again until January, and at that time it was impossible to get any information from him as to the progress of the deal.

Richards, also, testified that he and Nelson saw Lord Shaughnessy, at his office, as President of the Canadian Industrial Alcohol Company, in Montreal on August 25th, 1933, and that Lord Shaughnessy then authorized them to find a buyer for the seven or eight million gallons of whiskey of the Canadian Industrial Alcohol Company, or the Davis stock, and put a price on the whiskey of $6.00 per imperial gallon, which was about a third larger than the American gallon, and a price of $26.00 per share on the Davis stock.

According to Richards, Lord Shaughnessy, also, stated that his company had 7,000,000 gallons of American Type Rye Whiskey in Canada, and 1,000,000 gallons of Scotch whiskey, which was stored in Scotland.

Richards immediately returned to New York, and the next day, by letter dated August 25th, 1933, wrote Lord Shaughnessy:

"Just a line to thank you for a very pleasant visit yesterday, and to advise you that I am proceeding along the lines we discussed.
"I hope to communicate with you again within a few days."

Mr. Richards testified that he made an effort to sell the whiskey in question, or the Davis stock in the Canadian Company, to the Schenley Company, the second largest distillery in the United States, but did not succeed in interesting that company. He, also, said that through other sources he was subsequently introduced to Mr. Seton Porter, President of the National Distillers Products Corporation, about September 14th, and in his office then asked him whether he would be interested in the purchase of the whiskey of the Canadian Industrial Alcohol Company, or the control of the capital stock of that company, and that Mr. Porter was very much interested, but did not think inside interests were in accord, so doubted whether delivery would be possible.

As a result of this interview with Mr. Porter, at the request of Richards, one of the plaintiffs, as we have already pointed out, Lord Shaughnessy went to New York on October 3rd. Prior to that date, on August 31st, 1933, Mr. Richards wrote Lord Shaughnessy from New York:

"Referring to our telephone conversation this morning it has come to the notice of my associates that there have been negotiations through a representative of Lady Davis (a Mr. Johnson) for the sale of the stock in question belonging to the Estate.

"You can readily see that in such a case my people are reluctant to make a firm bid unless they are doing so through one negotiator.

"If agreeable to you and Lady Davis, will you be good enough to drop me a line stating that you both are negotiating through me. There need be no price mentioned in this letter and a time limit would be agreeable to me if it would cover a sufficient length of time usual in such cases, say two weeks.

"The matter has been given a great deal of study this week and I am sure a bid will be forthcoming within a few days after I am authorized as above in which case I will communicate with you immediately and come to Montreal, if necessary.

"You doubtless realize the obviousness of this request."

On September 7th, 1933, Richards wired Lord Shaughnessy—

"Referring to my recent letter could I have something definite to-day as my people are ready to make a bid early action important."

When Lord Shaughnessy came to New York, on October 3rd, Richards took him to see Mr. Porter, the president of the National Distillers Products Corporation, at his office, and told him, in the presence of Lord Shaughnessy, that he was there for the purpose of discussing the possibility of making a sale of the whiskey or the stock of the corporation he represented. After Lord Shaughnessy had stated that he would be very glad to have such an association according to Richards, Mr. Porter, in substance, said: "You know of course Lord Shaughnessy that $6.00 a gallon for 7,000,000 gallons of whiskey is a great deal of money. So much money is not available in the States at this time. Perhaps we can work out some other scheme of exchanging shares by making some kind of deal whereby we can have a perpetuating contract for the sale of whiskey and we can furnish the capital for which to merchandise it."

Lord Shaughnessy said he would like to know more about it. Porter then said: Suppose we organize a third company and operate through this other company, exchanging shares of the company—shares held by the Sir Mortimer Davis Corporation with shares of this new company. Lord Shaughnessy said that he didn't think that it was practicable or legal for an estate to exchange stock for something that didn't have so much of a market value, but that he would return to Montreal and investigate the matter and let us know. After the termination of the interview, Richards claimed that Lord Shaughnessy stated to him that he was glad to have met representative American interest who could help him in relieving him of his financial situation, though later on he was rather dubious as to whether the transaction suggested could be carried through.

On October 9th, 1933, Richards wrote Lord Shaughnessy:

"Following is a proposed plan we discussed in Mr. Seton Porter's office last Tuesday concerning the controlling interest of Canadian Industrial Alcohol Corporation of Canada.

"1. Form American Corporation, to be controlled and financed and operated by National Distillers Corporation of America.

"2. Sir Mortimer Davis Estate stock to be exchanged for a proportion, to be agreed upon, of preferred issue of said corporation.

"3. Necessary working capital to be represented by a proportion of the same preferred stock to be agreed upon. Common issue of stock to be divided in a proportion to be agreed upon between both parties.

"4. Terms and conditions to be wired at a future meeting as soon as possible between Lord Shaughnessy and Mr. Seton Porter after Lord Shaughnessy has presented the matter to his Board of Directors for approval.

"I hope that satisfactory terms can be arrived upon at the next meeting which I hope will be soon."

It appeared from several subsequent telephone calls that Lord Shaughnessy was insisting on some cash payment for the benefit of the Davis Estate.

According to Richards, he discussed this matter several times with Mr. Porter who said: "Well $250,000. won't stand in the way"; and Richards communicated that statement to Lord Shaughnessy by a letter dated October 13th. In this letter he said:

"After consulting the party we visited the other day I can say to you without committing anybody that the matter of a quarter of a million dollars cash payment will not stand in the way of a deal, providing the various other terms involved are satisfactory to both sides. Please keep in mind that dividends from the preferred stock will provide ample cash at regular intervals. In addition to this I should think some kind of sinking fund could be provided which would supply still more cash.

"At all event, the matter is in such shape today that I would strongly advise you to arrange such a meeting here as you suggested over the telephone, at as early a date as possible. As a matter of fact, the same suggestion has just been made to me by our friend here.

"If you care to telegraph me to arrange a date for such a meeting on Monday or Tuesday, I will gladly do so. I am anxious to strike while the iron is hot."

Richards subsequently called Lord Shaughnessy by telephone and was told by him that a payment of $250,000 was not enough. Richards communicated that statement to Porter who, according to him said: "A half million dollars would not stand in the way."

On October 18th, 1933, Richards wrote Lord Shaughnessy:

"Just want to verify the telephone conversation with you to-day.

"I had a meeting with Mr. Seton Porter, the result of which is that Mr. Porter feels it is very desirous for you to come to New York so that you and he can arrive at an agreement as to what can be done on both sides. He suggested that it might be a good idea to bring in your legal advisors here who, I understand, are Lord, Day & Lord. I can assure you that Mr. Porter is very seriously interested in this deal and I personally feel that it will not take more than a day of your time here to consummate the matter. I, also, feel that it is important to move as fast as possible, while the interest is at this pitch."

On October 19th, Richards telephoned Lord Shaughnessy, urging him further to come to New York, and, also, told him of Porter's alleged statement that $500,000 would not stand in the way of the completion of the deal. Most of the above letters were addressed to Lord Shaughnessy, as president of "Sir Mortimer Davis, Inc."

Perhaps the next letter of Richards to Lord Shaughnessy has very little importance, with the exception that it continued to urge him to come to New York and was merely addressed to Rt. Hon. Lord Shaughnessy, K. C., Canada Cement Building, Montreal, Canada.

Apparently, pursuant to this request, Lord Shaughnessy again came to New York November 1st. Richards saw him and arranged a meeting at Mr. Porter's office. This meeting was not only attended by Mr. Porter, Richards, and Lord Shaughnessy, but, also, by Mr. L. V. Wright, a Vice-President and the General Manager of the Canadian Industrial Alcohol Company. Richards had previously met

Mr. Wright at the office of Lord Shaughnessy at his hotel.
At this meeting, at Mr. Porter's office, most of the con-
versation was between Lord Shaughnessy and Mr. Porter.
In the first part of it, Lord Shaughnessy said the exchange
of stock was not practicable and the conversation then
drifted to a discussion of the functions of the third com-
pany, the American company; the formation of which was
being considered. That was to be a merchandising com-
pany. One end of it to be owned by the National Distillers
Products Corporation and the other end to be owned by the
Canadian Industrial Alcohol Company. It was to be the
medium through which the whiskey of the Canadian Com-
pany was to be marketed through the management of the
National Distillers.

They discussed the making of a contract, and in that
connection Richards, while on the stand as a witness,
was asked:

"Q. Was anything said at that time about a sale of the whiskey
to that third company?

"A. Oh yes. They wanted to make a contract as to the terms
under which they would operate. The details of this contract were
discussed in a general way, but the price of the liquor was not agreed
on at that meeting."

Lord Shaughnessy stated that as Lady Davis was one
of the trustees, apparently meaning of the Sir Mortimer
Davis Estate, he wanted her to be present when the basic
price for the whiskey was agreed on so that meeting
adjourned with the understanding that they would meet
again on the following day, as soon as Lady Davis was
available. Richards was not invited to and did not attend
that meeting, though, according to him, Lord Shaughnessy
said that he would send for him, and he, in fact, held him-
self in readiness to attend in case he should be notified.
After the meeting was over, Richards saw Lord Shaugh-
nessy at his hotel and was told by him that the price agreed

on for the whiskey and to be paid by the new company to be formed was $4.38 per American gallon, which was equivalent to $6.00 per imperial gallon. He claimed that Lord Shaughnessy, also, in substance, said to him that because of his work in the transaction he would be taken care of for life.

Lord Shaughnessy returned to Montreal a day or so later and from then on it was difficult for Richards to get in contact with him, though both Nelson and Richards accompanied him to the train when he left.

On November 15th, 1933, Richards wired Lord Shaughnessy in part as follows:

"Anxious to know situation stop when can expect you here * * *."

On November 16th, 1933, Lord Shaughnessy wired in reply "Wire received writing." But no reply letter was ever received by Richards.

On January 5th, 1934, Mr. Richards wrote Lord Shaughnessy, as president of Canadian Industrial Alcohol Company, Ltd.:

"Now that the negotiations between the National Distillers Products Corporation and the Canadian Industrial Alcohol Company, Ltd. have been satisfactorily completed, I would like to know what provisions have been made for my compensation for having originated the deal and having brought the principles together.

"Would you also be good enough to let me have a copy of the final agreement for my records.

"It is no doubt gratifying to you as it is to me to have this important business so successfully concluded.

"Please let me hear from you at your earliest convenience * * *."

On the twelfth day of January, 1934, Lord Shaughnessy replied:

"I have your letter of January 5th. As far as I know no provision has been made for any compensation to anyone in connection with this matter.

"You will no doubt remember that your original discussion concerned a proposed plan relating to the acquisition of the shares of the Sir Mortimer Davis, Inc., and possibly other shares of the Alcohol Company on the basis of an arrangement set forth in your letter to me of October 9th.

"You will, also, remember that for various reasons this transaction could not be completed and had to be abandoned. Subsequently Porter took up with Wright another situation which had been discussed between them many months previously, in an endeavor to work something out along those lines, and the negotiations have continued on that basis ever since.

"I do not know what arrangements you had with Porter, but would not like to have you labor under any misapprehension as to our relationship since at no time was the Canadian Industrial Alcohol Company interested in commission or compensation of any description."

On the fifth day of January, 1934, Richards also wrote Mr. Seton Porter, as President of National Distillers Products Corporation:

"I understand the negotiations between your company and the Canadian Industrial Alcohol Company, Ltd. have been satisfactorily concluded.

"I would like to inquire what provisions have been made for my compensation in having originated the business and for arranging the negotiations and for the introduction of the principles.

"An early reply will be appreciated."

On the eighth day of January, 1934, in reply to this letter, Mr. Porter wrote Richards:

"Your letter of January 5th is received and in reply would advise that I am naturally very much surprised that you are inquiring from us as to whether any provisions have been made for compensating you in connection with this matter.

"When Mr. Hoyt and you first called on me I explained to you that our company had been negotiating with these people for a long period of time and that we were already acquainted with them. We, of course, always assumed that as you stated you came to us from Lord Shaughnessy, who was your friend, you would look to him for any commission you might feel you were entitled to. * * *

"Subsequently, in conversation with Mr. Hoyt, we told him of this conversation with you and we believe we quote him correctly when we state that he said he realized you would look to your friend Lord Shaughnessy, for any compensation you thought you might be entitled to in the matter and not to us."

On cross-examination, on being asked whether when he first went to see Lord Shaughnessy in Montreal, the matter he had in mind was not the acquisition of the shares of the Davis Estate in the defendant company, Richards replied that there had been nothing but whiskey in this business from the very beginning whether it was by the purchase of the whiskey from the Canadian Industrial Alcohol Company, Ltd. or through the control of the shares of that company.

He, also, reiterated his statement that when Nelson first introduced him to Lord Shaughnessy, they were authorized to sell either the Davis stock or the whiskey.

Mr. Seton Porter, president of National Distillers Products Corporation, testified that he met Richards in the latter part of September, 1933; he did not know Lord Shaughnessy, and by appointment Richards brought him to his office on October 3rd, 1933. At that time the discussion between them was rather general, though the inference from his testimony was that it related to the sale of whiskey owned by the Canadian Industrial Alcohol Company, of which Lord Shaughnessy was President. This meeting was followed by several subsequent meetings and telephone conversations with Richards concerning what might be done to bring that about; and Richards had something to do with the meeting with Porter, which was attended by Lord Shaughnessy and Mr. Wright, also of the Canadian Industrial Alcohol Company, and others, including Richards.

The repeal of the eighteenth amendment went into effect on December 5th, 1933. A memorandum agreement between the National Distillers Products Corporation and the Canadian Industrial Alcohol Company was made on the twenty-second day of December, 1933. That agreement provided, in substance, for the formation of an American corporation with a capital stock of $2,000,000, and each of

the contracting corporations was to hold one-half of that issue. The National Distillers Corporation was to pay $1,000,000 in payment of its share of that stock. The Canadian Industrial Alcohol Company, on the other hand, was to pay for its stock by the delivery of $1,000,000 worth of whiskey at an agreed price.

The new American corporation was, also, to agree to purchase 7,000,000 gallons of whiskey from the Canadian Industrial Alcohol Company, and was to pay therefor $30,660,000 in specified installments. This amount was payable in Canada.

National Canadian Distillers, Inc., the new corporation provided for in the agreement with National Distillers Products Corporation, was organized under the laws of the State of Delaware, and in January, 1934, it made an agreement with the defendant below for the purchase of its stock of whiskey. Delivery was to be made in specified installments, and the whiskey was to be paid for in the same manner.

Though Lord Shaughnessy denied that Nelson and Richards were, under any circumstances, to be paid any commission by that company, he. apparently, admitted that they were authorized to procure a purchaser for the Davis stock, but denied that he ever authorized them, either by express agreement, or otherwise, to procure a purchaser for the stock of whiskey belonging to the Canadian Industrial Alcohol Company.

Other facts appear in the opinion of the court, but, from the standpoint of the plaintiffs below, this statement is sufficient.

The jury in the court below rendered a verdict in favor of Nelson and Richards for $100,000. The Canadian Indus-

trial Alcohol Company moved for a new trial, claiming, among other things, that the evidence would not sustain the verdict. This motion was refused.

The numerous assignments of error relied on by the Canadian Industrial Alcohol Company, the defendant below, the plaintiff in error, appear in the opinion of the court.

HARRINGTON, J., delivering the opinion of the Court:

The first and third assignments of error involve practically the same question and will be considered together.

Over the objection of the defendant company, one of the plaintiffs' attorneys was permitted to ask Mr. Porter, the president of the National Distillers Products Corporation, and a witness in the case, on direct examination

"But you always, Mr. Porter—did you not write Mr. Richards under date of January 1st, 1934 (apparently meaning January 8th, 1934) 'we, of course, always assumed that as you stated you came to us from Lord Shaughnessy, who was your friend, you would look to him for any commission you might feel you were entitled to.' "

To this question the witness answered "Yes."

The precise language above quoted and included within single quotation marks was taken from a letter from Mr. Porter to Mr. Richards, dated January 8th, 1934, and at a later stage of the trial that letter was, also, admitted in evidence over the objection of the attorney for the defendant below. The whole of it appears in the statement of facts, and it will not be repeated here, but portions of it clearly were not harmful to the defendant.

It is contended that, because of the paragraph already quoted from that letter and incorporated in the question asked Mr. Porter, it was not only improperly admitted, but was, also, harmful by reason of its possible bearing on the existence of the relation of principal and agent between the

defendant, the Canadian Industrial Alcohol Company, Ltd., and Richards.

Using precisely the same language, but slightly transposing the position of the words in the sentence and paragraph quoted, Mr. Porter in that letter, in substance, said: As you stated you came to us from Lord Shaughnessy, who was your friend, we, of course, always assumed that you would look to him for any commission you might feel you were entitled to.

That letter was offered in the court below by the plaintiffs in an action by them against the Canadian Industrial Alcohol Company for the recovery of commissions claimed to be due them from that company for services rendered in connection with the bringing about, or helping to bring about, the execution in December, of 1933, and in January of 1934, of contracts for the sale of a large quantity of whiskey belonging to the Canadian Company; and Mr. Porter's statement, both in his letter to Richards and in his reference to that letter while on the stand, could only have been offered to aid in showing agency and was clearly hearsay evidence. *Redden v. Spruance,* 4 *Harr.* 265; *Ellis & Co. v. Farrell,* 146 *Ark.* 274, 225 *S. W.* 349; *Central Bureau of Engraving v. Schmidt-Wilkes Electric Co. (Sup.),* 107 *N. Y. S.* 219; *Rothchild v. Schwartz,* 28 *Misc.* 521, 59 *N. Y. S.* 527; *Hammond v. Hammond Buckle Co.,* 72 *Conn.* 130, 44 *A.* 25; 14 *Ency. of Ev.* 718; see, also, *Nye Odorless Incin. Co. v. Felton,* 5 *W. W. Harr.* (35 *Del.*) 236, 162 *A.* 504.

The relation of principal and agent can be shown by the direct testimony of the alleged agent, but it can not be shown by his mere unsworn statements to that effect to a third person and the assumption of that person based thereon, whether that assumption is stated by letter, or otherwise. *Penington v. Commonwealth Hotel Const. Corp.,*

18 *Del. Ch.* 170, 156 *A.* 259; *Phleger v. Ivins,* 5 *Harr.* 118; *Oldham v. Cooper,* 5 *Del. Ch.* 151; *Chamberlayne's Handbook on Ev.,* § 540.

Perhaps, we should, also, state that when Mr. Porter was examined with respect to the statements made by him in his letter to Richards of January 8th, 1934, that letter had not been admitted in evidence, but no objection is or was made on that ground.

The letter of January 8th, 1934, above referred to, was written by Mr. Porter to Mr. Richards, one of the plaintiffs, in reply to a letter, dated January 5th, 1934, written by Richards to Porter. The Richards' letter was offered and admitted on the request of the attorneys for the plaintiffs below, and its admission was not objected to by the attorney for the Canadian Industrial Alcohol Company. In fact, it is apparent that he had intended to offer it as a part of his defense on the theory that it was an admission by Richards against interest, but it, nevertheless, was not admitted on his request. As it was not objected to, it is unnecessary for us to consider whether it was admissible as an admission. That letter was as follows:

"I understand the negotiations between your company and the Canadian Industrial Alcohol Company, Ltd. have been satisfactorily concluded.

"I would like to inquire what provisions have been made for my compensation in having originated the business and for arranging the negotiations and for the introduction of the principles. * * *"

Though Mr. Porter, both in his letter and while testifying as a witness, clearly based his conclusions, as to the possible rights of Richards, on the statements made by Richards to him, because the Porter letter of January 8th, 1934, was in reply to the above letter, the attorneys for the plaintiffs below contend that the hearsay evidence rule does not apply.

One part of an oral statement of a person admitted in

evidence, and whether in the nature of an admission against interest, or for the purpose of affecting the credit of a witness, or otherwise, may often be explained, or materially qualified by other portions of the same statement made by him relating to the same subject matter.

When that is true, and when a part of such statement has been offered and admitted, a proper application of the principles of right and justice permit, and sometimes require, that the remainder of the statement be, also, admitted. *Trischet v. Hamilton Mutual Ins. Co.*, 14 *Gray (Mass.)* 456, 457; *Rouse v. Whited*, 25 *N. Y.* 170, 82 *Am. Dec.* 337; *Prince v. Samo*, 112 *Eng. Repr.* 606; *Jones on Ev.* (*2d Ed.*) 1103, 1340; see, also, *Collins v. Todd*, 17 *Mo.* 537.

In *Rouse v. Whited*, 25 *N. Y.* 170, 82 *Am. Dec.* 337, *supra*, the court, quoting from 1 *Phillips on Ev.* (*4th Amer. Ed.* from the *10th Eng. Ed.*) 416 said:

"Where a statement, forming part of a conversation, is given in evidence, whatever was said by the same person in the same conversation, that would in any way qualify or explain that statement, is also admissible, but detached and independent statements, in no way connected with the statement given in evidence, are not admissible, and there is no difference in this respect between statements made in conversation by a party to the suit and those made by a third party."

The same general principles not only usually apply when a part of a letter is offered in evidence, but, also, apply when a pertinent and material letter of one party has been offered and admitted, and there are other relevant, qualifying or explanatory letters of the other party affecting the meaning of that letter in the correspondence between them. *Trischet v. Hamilton Mut. Ins. Co.*, 14 *Gray (Mass.)* 456; *Southern Pacific v. Stephany* (*C. C. A.*), 255 *F.* 679; *Wig. on Ev.*, §§ 2104, 2120; *Chamberlayne's Handbook on Ev.*, §§ 274, 550; *Jones on Ev.* (*2d Ed.*) 1344; see, also, *Backes v. Movsovich*, 82 *N. J. Law* 44, 81 *A.* 497.

That is, particularly, true when a relevant reply letter,

written by one of the parties to an action, has been put in evidence, and that letter is explained or qualified in some material particular by the previous letter of the other party to which it is an answer. *Trischet v. Hamilton Mut. Ins. Co.*, 14 *Gray (Mass.)* 456; *Wig. on Ev.*, §§ 2104, 2120; *Jones on Ev.* (2d Ed.) 1344; see, also, *Collins v. Todd*, 17 *Mo.* 537.

As was said in *Trischet v. Hamilton Mut. Ins. Co.*, supra,

"Where a letter is written in answer to another, it may often be unintelligible without referring to the previous one. By referring to the letter to which he is replying, the writer, to that extent, makes it a part of his own communication. * * * Where a statement is made in the course of a conversation or correspondence, which is itself admissible in evidence, the rest of the conversation or correspondence must be admitted, so far as it is connected with and necessary to the full understanding of what follows."

In *Collins v. Todd, supra,* in an action for assault and battery, the court, however, refused to permit the defendant to put in evidence his subsequent oral statements in denial of the plaintiff's statement, made in the same conversation, as to what had taken place between them, when the defendant himself had put the plaintiff's prior statement in evidence.

But, independent of any possible question as to when and under what circumstances a reply letter, not in itself independently relevant, may be said to qualify or explain a prior relevant letter of another person, previously admitted in evidence, the general rule as to completeness, apparently, does not usually apply when a party to an action seeks to put in evidence a letter received by him from a third person in reply to a letter from him; and in most cases such a letter can be nothing more than hearsay evidence. That is true in this case. *Chamberlayne's Handbook on Ev.*, § 550; see, also, *Texas Co. v. Brilliant Mfg. Co. (C. C. A.)*, 2 F. (2d) 1.

It is true that there are cases where a party's letter of a self-serving nature to a third person in reply to a letter

from that person, charging him with the commission of some act, particularly of an incriminating nature, has been admitted in explanation or denial of the act charged, and, perhaps, to rebut any possible inference that might arise from silence. See *Wig. on Ev.*, §§ 281, 2120, *note*.

That rule was, apparently, applied in *Crawford v. U. S.*, 212 *U. S.* 183, 29 *S. Ct.* 260, 53 *L. Ed.* 465, 15 *Ann. Cas.* 392, but in *York v. U. S. (C. C. A.)*, 241 *F.* 656, the court refused to apply it, and treated the reply letter as purely self-serving when the prior accusatory letter had been offered by the defendant himself and not by the prosecution.

That the court below was in error when it admitted the letter of Porter to Richards of January 8th, 1934, is, therefore, apparent.

Over the objection of the defendant, the attorneys for the plaintiffs below were, also, permitted to question Mr. Porter as follows:

"Right. And you were content to go on with Mr. Richards assuming that he represented the Canadian Industrial Alcohol Company, Ltd., if he would bring them to a satisfactory proposition?"

To this question, the witness, also, answered "Yes."

In the second assignment of error, the attorney for the defendant below, the plaintiff in error, claims that this question was, also, objectionable because it tended to prove agency by Mr. Porter's mere assumption, probably based on the statements of Richards that he represented that company.

As we view it, when the question is read in connection with the evidence immediately preceding it, it can not fairly be said to be subject to that objection.

The effect of Mr. Porter's testimony in that connection is that when Richards came to see him about the purchase

of the stock of whiskey belonging to the Canadian Industrial Alcohol Company, he told him that the National Distillers Products Corporation had already been negotiating with that company with respect to that whiskey, and there is nothing to indicate that the words "assuming that he represented" the Canadian Company meant anything more than "if," or "in case" he represented that company, or some other similar words of like meaning.

The fourth assignment of error is based on the refusal of the trial court to permit counsel for the defendant below to ask a witness for the plaintiffs in cross-examination, "assuming that the liquor was to be delivered over a series of years ending March 31st, 1937, and the liquors were to be paid for in quantities taken from time to time, would you say that you would think the reasonable value of the services would depend on the actual delivery and payment for the whiskey pursuant to the terms of the contract?"

The sixth assignment of error is based on the refusal of the trial court to charge the jury as requested by the defendant below, "If you believe that the plaintiffs were employed by the defendant to sell the defendant's whiskey, the plaintiffs' recovery, if any, must be limited to the extent to which their efforts were successful in carrying out their contract, that is for the services in regard to whiskey actually sold and delivered, and in any event they can recover only to the extent that their knowledge, skill, experience, ability and services resulted in bringing about such sale."

A broker is entitled to compensation when he has fully performed all of the duties and services required of him by his contract of employment; and this is true though such services were not as beneficial to the principal as he had expected.

Further than that, if the broker has fully performed all the services required of him in his contract, it is, also, immaterial to his right of recovery that the principal has likewise performed services in order to complete the transaction, but not caused by the broker's default. 1 *Clarke & Skyles on Agency*, §§ 360, 771; see, also, *Hawkins v. Chandler*, 8 *Houst.* 434, 32 *A.* 464; *Tebo v. Mitchell*, 5 *Penn.* 356, 63 *A.* 327; *Fox v. Ryan*, 240 *Ill.* 391, 88 *N. E.* 974; *Heldmyer v. Cleaver*, 7 *Boyce* 135, 104 *A.* 635.

In *Tebo v. Mitchell*, 5 *Penn.* 356, 63 *A.* 327, 328, *supra*, the Superior Court said:

"When the broker has brought to his employer a purchaser willing and able to purchase at the price and on the terms authorized by the employer, the broker's work is done, and he is entitled to his compensation."

Generally speaking, when the principal, without any fraud practiced on him by the agent, freely and voluntarily accepts the person or corporation produced by the agent, and enters into a binding contract, whereby that person or corporation agrees to purchase the property, which was the subject matter of the agency, no question as to the willingness or ability of that party to purchase can then be raised by the principal. *Fox v. Ryan*, 240 *Ill.* 391, 88 *N. E.* 974; *Roche v. Smith*, 176 *Mass.* 595, 58 *N. E.* 152, 51 *L. R. A.* 510, 79 *Am. St. Rep.* 345; 2 *Clarke & Skyles on Agency*, § 773; 3 *South. on Damages*, § 683.

That neither of these assignments of error can be sustained is, therefore, apparent. Though contradicted, there is evidence in the record that in the summer of 1933 Nelson and Richards were authorized to procure a purchaser for either the stock of whiskey belonging to the Canadian Industrial Alcohol Company, or the controlling stock interest in that corporation held by "Sir Mortimer Davis, Inc."

There is, also, uncontradicted evidence that in December, of 1933, the Canadian Industrial Alcohol Company made a contract with the National Distillers Products Corporation wherein it was among other things agreed:

1.    That a new American corporation, with a capital stock of $2,000,000, should be organized by the contracting parties; the capital stock of which was to be held by them in equal shares. The National Distillers Products Corporation was to pay $1,000,000 in cash for its share of this stock, but the Canadian Industrial Alcohol Company was to pay for its share by the delivery of whiskey at an agreed price of $4.38 per gallon.

2.    That the new American corporation to be created should, when organized, make a contract with the Canadian Industrial Alcohol Company, Ltd. for the purchase from that corporation, at a prescribed price, of approximately 7,000,000 gallons of whiskey owned by it and stored in Canada.

Both of these provisions of this contract were carried out, and there is evidence in the record that will sustain the contention that Richards, acting on behalf of himself and Nelson, contributed, at least in some degree, to the execution of it and to the making of the plan, therein provided for, for the sale of its whiskey by the Canadian Company.

After the organization of the new American company, the National Distillers Products Corporation paid $1,000,-000 in cash for its share of the capital stock of that company, and the Canadian Industrial Alcohol Company likewise delivered to that corporation whiskey of a like value, namely 238,310 gallons, in payment of its share of such stock.

On the fifteenth day of January, 1934, the new American corporation made the contract with the Canadian Industrial Alcohol Company, Ltd., for the purchase of its stock of whiskey in accordance with the provisions of the original contract above referred to.

It is true that only about 200,000 gallons of whiskey, of the approximate value of $876,000, were ever delivered under that particular contract, and that in January of 1935 the National Distillers Products Corporation made some sort of an arrangement with the Canadian Industrial Alcohol Company whereby the Products Corporation disposed of its stock in the new American corporation to the Canadian Company, but these facts do not affect the principle involved.

As we have already seen, in the latter part of the prayer quoted in the sixth assignment of error, the court below was, also, requested by the defendant below to instruct the jury "and in any event they (Nelson and Richards) the plaintiffs in that court can recover only to the extent that their knowledge, skill, experience, ability and services resulted in bringing about such sale." So far as their services were concerned, the jury was charged substantially as requested, but they were not instructed that they could recover "only to the extent" that their knowledge, skill, experience and ability, as well as their services, resulted in bringing about the sale. They were instructed, however, that if their verdict should be for the plaintiffs, it should be for such an amount as they should find "from a careful consideration of the evidence in the case their services were fairly and reasonably worth."

It may be unnecessary to decide that question, but when a broker has so carried out his contract of employment, as to be entitled to a commission, and it has not been agreed on, in most cases if there is a well established

customary trade rate or usage relating thereto, his compensation is probably governed thereby (*Graves v. Dill*, 159 *Mass.* 74, 34 *N. E.* 336; 1 *Mech. on Agency* [*2d Ed.*], § 1526; 3 *South. on Damages* [*4th Ed.*] 2509) ; but if there is no fixed and established customary rate of commission he is entitled to recover such an amount as his services were fairly and reasonably worth under all the facts and circumstances proved. 1 *Mech. on Agency* (*2d Ed.*), § 1526; 3 *South. on Damages* (*4th Ed.*) 2509.

■■■ Where the employment is of a professional nature, requiring the use of particular ability, experience, knowledge, skill and previous study, the scope and range of the evidence in ordinary cases not of that nature is somewhat broadened, and when proved these facts, among other pertinent facts, may be considered by the jury. *Eggleston, etc., v. Boardman*, 37 *Mich.* 14; *Stanton v. Embrey, Adm'r*, 93 *U. S.* 548, 23 *L. Ed.* 983; *Vilas v. Downer*, 21 *Vt.* 419; *Ky. Bank v. Combs*, 7 *Pa.* 543; *Hope et al. v. Burton*, 5 *Boyce* 22, 90 *A.* 466.

It may, perhaps, be questioned whether brokers, such as the plaintiffs, are within that rule (see *Mayhew v. Brislin*, 13 *Ariz.* 102, 108 *P.* 253), but, at any rate, our attention has been called to no evidence in the record that would justify the instruction prayed for in this case.

Further than that, such an instruction would be too restricted in its nature to fairly state the law. When a broker has performed services, in determining what is a reasonable compensation, the jury may and should consider all the pertinent facts and circumstances proved, but the extent of his recovery is not necessarily limited by his knowledge, skill, experience or ability.

■■■ Under its fifth assignment of error, the Canadian Industrial Alcohol Company, Ltd., the defendant

below, claims that even if Nelson and Richards, the plaintiffs below, were actually employed by it under an express contract to sell the whiskey in question that pursuant to its prayer to that effect, by reason of the facts proved, the jury should, also, have been instructed that the measure of their recovery was necessarily limited to the reasonable value of their services at the place where the alleged agency contract was made, namely, at Montreal, Canada.

This prayer was predicated on the contention that the contract was made in Canada, and as there was nothing in its terms, or in the uncontradicted surrounding facts and circumstances, that might properly be considered in interpreting its meaning, to indicate that it was to be performed elsewhere, the measure of damages on its breach was necessarily governed by the law of Canada.

As was said in *Beale on the Conflict of Laws, Page* 1259: "The place of performance of a contract is the State where either, by specific provision or by interpretation of the language of the promise, the promise is to be performed. * * * In the absence of specific language or of circumstances indicating a contrary intention, a contract is to be performed in most cases at the place of contracting, as has often been laid down in the cases." *Hall v. Hoff,* 295 *Pa.* 276, 145 *A.* 301; *Meyer v. Estes,* 164 *Mass.* 457, 41 *N. E.* 683, 32 *L. R. A.* 283; *Cubbedge v. Napier,* 62 *Ala.* 518; *Brown v. Camden & A. R. Co.,* 83 *Pa.* 316; see, also, *Beale on Conflict of Laws* 1098, 1271, 1223, 1224, 1333; *Goodrich on the Conflict of Laws,* 183; *Restatement of the Conflict of Laws,* §§ 372, 413.

This is because the obligation to pay damages for the non-performance of a contract is a matter of substantive right, imposed by the law as a substitute for performance, and should, therefore, be measured by the law of the place where such performance was promised. *Goodrich on the*

*Conflict of Laws* 183; *Wharton on the Conflict of Laws* 928, 929. There are cases that are inconsistent with this conclusion, but it is unnecesary for us to consider them.

Lord Shaughnessy was the president of both Sir Mortimer Davis, Inc., and of the Canadian Industrial Alcohol Company, and both of the plaintiffs, in substance, testified that he said to them in Montreal—Go ahead and find a purchaser for either the whiskey of the Canadian company or the Davis stock in that company, if you can.

Lord Shaughnessy, apparently, did not deny this statement, so far as it related to the Davis stock, but he did deny that at that, or at any other time, he ever authorized Nelson and Richards to find a purchaser for the whiskey belonging to the defendant below, the plaintiff in error.

He, also, claimed, however, that he had repeatedly told Nelson that he could not expect any commissions from the Davis Company.

In an oral contract, such as this, where there were numerous letters, telegrams and conversations between Nelson and Lord Shaughnessy, before the meeting in Montreal in August, of 1933, which Richards attended, other facts and circumstances must be considered in determining the intent of the parties, as to where the alleged agency contract was to be performed.

The record is so voluminous that it is difficult to point out what, if any, details in the surrounding facts and circumstances, that might be considered in determining this intent, were disputed, and were, therefore, jury questions, but some of the outstanding facts clearly can be considered by us in determining that intent. This is conceded by both parties.

It is true that the whiskey in question was stored in

Canada, but there is some intimation that the Canadian Industrial Alcohol Company considered the possibility of selling it in this country for medicinal purposes, perhaps prior to the Eighteenth Amendment, though that is not perfectly clear. At any rate, it is undisputed that the real important question in its plan for disposing of that whiskey depended upon the repeal of the Eighteenth Amendment by the United States. Further than that, it is undisputed that both Nelson and Richards were residents of New York, and were in business there, and that all of the possible purchasers suggested by Nelson, prior to the meeting attended by Richards, in Montreal, were undeniably from New York.

When Nelson told Lord Shaughnessy about Richards, and whom his friends and connections were, the natural inference to be drawn from his statement is that he referred to persons in New York.

From these and other undisputed facts proved, every reasonable inference is in favor of the conclusion that the parties intended the agency contract, even if made in Canada, to be performed in New York. But, in any aspect of the case, was the contract made in Canada?

There is evidence that Nelson and Richards were authorized to find a purchaser for the whiskey belonging to the Canadian Industrial Alcohol Company, but there is no evidence that they, in any way, bound themselves by any agreement to that effect. In other words, the contract relied on was a mere unilateral contract that did not take effect, or become binding on the parties, until a person, ready, willing, and able to buy, had been produced by the alleged agents. *Beale on the Conflict of Laws,* § 1067; 1 *Mech. on Agency,* § 31; see, also, *Restat. of the Law of Contracts,* § 12.

As was said by Professor Beale, in his *Work on the Conflict of Laws, supra,* "If the principal requests the agent to do some act, which the agent is under no obligation to do, a unilateral contract to compénsate * * * the agent is formed when the agent performs the requested act." Therefore, a contract of that character is deemed to have been made at the place where the last act, necessary to make it a binding agreement, takes place. *Beale on the Conflict of Laws,* 1067; *Goodrich on the Conflict of Laws,* 218; 5 *R. C. L.* 935; see, also, *Restat. of the Conflict of Laws,* §§ 74, 323; *Howell v. North,* 93 *Neb.* 505, 140 *N. W.* 779.

Applying these principles to a concrete case, similar to this, Professor Beale, on page 1067 of his *Work on the Conflict of Laws, supra,* adds:

"Ordinarily this is the case when a real estate broker is employed, and, when this is so, the place of contract is where the last act, necessary to make the contract binding, occurred; that is the place where the broker produced the purchaser."

That all of the details in connection with the contracts relating to the purchase of the whiskey belonging to the defendant company were worked out in New York, and that the purchaser was, therefore, produced in that State, is apparent from the undisputed facts proved.

The court below, therefore, committed no error in refusing to charge the jury in accordance with the fifth prayer of the defendant below, the plaintiff in error.

The Seventh, Eighth, Ninth, Tenth, Eleventh and Twelfth Assignments of Error are as follows:

"(7) The Court erred in charging the jury as follows:

" '* * * The new corporation, which has been designated as the partnership corporation, was to contract to buy from Canadian Industrial Alcohol Company upwards of 7,000,000 gallons of whiskey at a price of upwards of $30,660,000.

" 'The second contract we shall designate as the contract of sale. It is in evidence. It is executed by the new partnership corporation

and Canadian Industrial Alcohol Company to the partnership corporation of 7,000,000 gallons of whiskey at a gross price of $30,660,000.'

"(8)   The Court erred further in charging the jury as follows:

" 'The plaintiffs claim to be entitled under their contract to a reasonable and fair compensation for their services, and they contend that 5% of the contract sale price is such fair and reasonable compensation to them for their services.'

"(9)   The Court erred further in charging the jury as follows:

" 'If you shall be satisfied by a preponderance of the evidence that plaintiffs, as agents of the defendant, brought the National Distillers Products Corporation and the defendant together, and if, as the result thereof, there was an agreement to purchase the whiskey of the defendant, the right of the plaintiffs to compensation for their services then became established, the work of the plaintiffs was then done, and they then became entitled to their compensation.'

"(10)   The Court errer in declining to grant the defendant's motion for a new trial on the ground that the verdict was against the evidence.

"(11)   The Court erred in declining to grant the defendant's motion for a new trial on the ground that the verdict was against the weight of the evidence.

"(12)   The Court erred in declining to grant the defendant's motion for a new trial upon the ground that the verdict was excessive."

■ The seventh assignment of error relates to a statement made by the trial court relating to the claims of one of the parties. It merely referred to a claim based on undisputed facts proved and was, therefore, not subject to the objection that it was a comment on evidence. See *Turner v. Osgood Art Colortype Co.*, 223 *Ill.* 629, 79 *N. E.* 306.

■ The eighth assignment of error was, also, merely a statement of one of the claims of the plaintiffs below, and was not objectionable.

■ ■ From what we have already said, it is, also, apparent that that part of the charge of the court below, incorporated in the ninth assignment of error, correctly stated the law, and that the facts required an instruction of that nature.

██ The contract price for the 7,000,000 gallons of whiskey which the Canadian Industrial Alcohol Company agreed to sell was $30,660,000, and the verdict was for $100,000. We have already pointed out sufficient facts to show that there is evidence to support this verdict and the refusal of the trial court to grant a new trial on the motion of the defendant below. But other important facts bearing on the same question appear in the preliminary statement of facts.

No other comments with respect to the tenth, eleventh and twelfth assignments of error are necessary.

██ The only other question to be considered is whether the improper admission by the court below of the letter of Porter to Richards, of January 8th, 1934, and of the testimony of Porter relating thereto were so manifestly prejudicial to the Canadian Industrial Alcohol Company, the defendant below, as to be reversible error.

It is true that the question of agency was disputed and was one of the main issues involved in the case; and as we have already pointed out the Porter letter had some possible direct bearing on that question, because of the statements of Richards to Porter therein referred to, but there was not only other direct evidence of agency of like nature in the testimony of both Nelson and Richards, but also proof of other pertinent facts and circumstances bearing on that question in their testimony, as well as in other unobjectionable testimony of Mr. Porter.

In other words, disregarding the letter improperly admitted, there was still ample evidence, both direct and circumstantial, of the existence of the relation of principal and agent between Nelson and Richards and the Canadian Industrial Alcohol Company, in relation to the matters in controversy in this suit, to justify the verdict. Whatever

some of the letters of Richards, standing alone, might indicate, as to the scope of the alleged agency, that he not only arranged, but was, also, permitted to attend some of the meetings between Porter and Lord Shaughnessy, at which various details finally culminating in the execution of the contract for the sale of the whiskey were discussed cannot be denied.

Nor is it clear that the discussions at those meetings were confined to the possible sale of the Davis stock.

Our conclusion, therefore, is that the admission of the Porter letter to Richards could not have influenced the verdict, and was not so prejudicial to the defendant below, the plaintiff in error, as to constitute reversible error. See *Gray v. Borough of Danbury, 54 Conn.* 574, 10 *A.* 198; *Kelley v. Lehigh Valley R. Co.,* 236 *Pa.* 110, 84 *A.* 754; 3 *Amer. Jur., Appeal and Error,* 581; see, also, *Townsend v. Poynter,* 3 *W. W. Harr.* (33 *Del.*) 53, 130 *A.* 267; *Director General of Railroads v. Johnston,* 1 *W. W. Harr.* (31 *Del.*) 397, 114 *A.* 759; *Philadelphia & R. Ry. Co. v. Green & Flinn,* 2 *W. W. Harr.* (32 *Del.*) 78, 119 *A.* 840.

When the evidence, considered as a whole, is not only conflicting, but is, also, almost evenly divided in support of the claims of the respective parties, an appellate court may be more inclined to reverse the court below for the erroneous admission of evidence, though there is other unobjectionable evidence of the same facts in the record (see *Townsend v. Poynter, supra*), but when the evidence in this case is considered as a whole, it does not seem to be a case of that nature.

The judgment of the court below is, therefore, affirmed.

LAYTON, C. J. (dissenting) :

I regret that I am unable to agree that the judgment should be affirmed for two reasons.

The first assignment of error is based upon the overruling of an objection to a question put to the witness, Porter, "Did you not write to Mr. Richards under the date of January first, 1934, 'We of course always assumed that as you stated you came to us from Lord Shaughnessy who was your friend. You would look to him for any commission you might feel you were entitled to'?"

The third assignment was based upon the ruling of the court that the letter, of which the language of the question was a part, was admissible.

The letter contained two statements harmful to the defendant. The first is in that sentence in which the writer, Porter, assumes that Richards would look to Shaughnessy for commissions to which he might feel he was entitled. The second is in the last paragraph in which it is stated that Hoyt said he realized that Richards would look to Shaughnessy for any compensation to which he thought he was entitled.

The second assignment is based upon the overruling of an objection to a question asked of Porter, "And you were content to go on with Mr. Richards assuming that he represented Canadian Industrial Alcohol, Limited, if he could bring them to a satisfactory conclusion?"

The court is agreed that the answer to the first question and the letter were not admissible under any theory of evidence, and that there was error. With respect to the second assignment, the court is of opinion that there was no error.

I agree that, compared with the error involved in the first and third assignments, the error involved in the second assignment pales into insignificance, but I think the question was an improper one. The form of the question was objectionable. The affirmative answer proved nothing. It

was an effort, and a successful one, to get before the jury the idea of Porter's conclusion that Richards was the defendant's agent.

From repeated readings of the record of the testimony I am impressed with the persistent attempts of counsel for the plaintiffs to have in evidence the assumptions, conclusions, or if it may please, the thought or idea of Porter that Richards was the defendant's agent, and should look to the defendant for his compensation.

The record shows at least three prior attempts, all of them, unsuccessful, to get before the jury Porter's assumptions or conclusions. These questions were undoubtedly both improper and prejudicial. The first question was, "You assumed, Mr. Porter, in all these negotiations between Mr. Richards, yourself and Mr. Hoyt that Mr. Richards would get his commission in this deal from the Canadian Industrial Alcohol Company, Limited, did you not?" The form of the question suggested not only that Richards was entitled to a commission but would receive it from the defendant. The second question was shorter in form but was equally dangerous in its suggestion. It was, "You assumed that he was going to be paid by Canadian Industrial Alcohol Company, Limited?" The third was, "Didn't you assume that fact, that he was going to be paid by Canadian Industrial Alcohol, Limited?"

The court properly sustained the objections interposed to these questions, as being mere hearsay and not binding upon the defendant.

The jury's attention was drawn to the importance attached to the matter of the questions, and the court, having correctly ruled thus far, surprisingly reversed itself, and permitted the question and the letter which are the basis of the first and third assignments of error. The persistency of counsel for the plaintiffs had its reward.

Porter and Hoyt were not casual onlookers. Their names, especially Porter's, appear constantly in the evidence, as persons having familiarity with the subject of the controversy. Assumptions or conclusions of fact coming from such persons were calculated to strike with force the minds of the jury. So, we have from this entirely objectionable testimony the suggestion that Porter and Hoyt believed that the plaintiffs were entitled to commissions and that the defendant should pay them. I use the word "suggestion" in the sense that a strong argumentative inference of belief could, and no doubt was, drawn from this testimony.

Every trial lawyer of experience knows the interest displayed by a jury in a spirited contest over the admission of testimony with respect to an important issue. The most inattentive or somnolent juror becomes alert. The testimony is impressed strongly upon their minds; and when the court admits the testimony the jury is told, in effect, that they must and should consider it as having probative value.

Counsel for the plaintiffs were intent upon the objectionable matter being in evidence for two very substantial reasons, first for its supposed evidential value, second as a matter and basis for argument to the jury. The result was that there was testimony, oral and written, absolutely valueless as evidence, and so declared to be in the opinion of the court, bearing upon a vital issue of the case, put before the jury with all the sanction of the court that they should give it consideration. The presumption is, of course, that the jury did give it consideration. 3 *Am. Juris., Appeal and Error*, 505.

The opinion of the court holds that, while there was error, it worked no injury. It is said that, disregarding the

testimony and letter improperly admitted, there was ample evidence, both direct and circumstantial, of the relationship of principal and agent between the plaintiffs and the defendant. The statement is followed by the arbitrary conclusion that the testimony could not have influenced the verdict.

The court's conclusion is that the testimony and letter, strenuously insisted upon by the plaintiff as having probative value and admitted by the court over proper objection, testimony directed to the heart of the controversy, doubtless commented upon forcefully to the jury, and presumptively considered by them, was, after all, harmless.

The plaintiff realized the help of it. The defendant knew its hurt. The court, by its ruling told the jury it was evidence fit to be considered. For what reason may it be supposed that the jury disregarded that which the court said they might and should consider? And why, it may be asked, should it be supposed that a jury of laymen would engage in a discussion of the precise meaning of the word "assume"?

This court evidently holds that the use of the word, "assume" meant nothing more than "if," or "in case"; that Porter's testimony and the letter necessarily conveyed that thought only to the jury, and, therefore, it was necessarily harmless. The answer is, I think, that counsel for the plaintiffs did not so regard the testimony, nor did the trial court. The testimony was admitted for the reason that it was considered to have probative effect, and no one can say that it had no harmful effect.

The evidence characterized by the court as "ample," is said to be both direct and circumstantial. The direct evidence is almost entirely that of Nelson and Richards, the two plaintiffs. Nelson described himself as a financial

agent. Richards gave his occupation as that of a private banker engaged in various kinds of business and financing. Nelson had known Shaughnessy. Richards met him for the first time on August 25th, 1933, in Montreal, and then and there, according to Richards, Shaughnessy agreed to employ him, an entire stranger, as the exclusive agent for the sale of the whiskies of the defendant company, or for the shares of stock of the defendant company held by Sir Mortimer Davis, Inc.

It would seem to be a just conclusion that these plaintiffs were persons of reasonable experience, knowledge, judgment and acuteness, and that they were reasonably conversant with corporations and the powers of corporate executives. Both being financial agents and men of affairs it is not unreasonable to suppose that they recognized the importance of a writing or memorandum confirmatory of an oral agreement, especially where the agreement was concerned with an exclusive agency involving many millions of dollars. Yet the record discloses the spectacle of two experienced persons, one of them saying that they both were chosen as exclusive agents, the other that he alone was. selected as exclusive agent, to effect the sale of whiskey amounting to millions of dollars, or the stock of Sir Mortimer Davis, Inc., vested in three executors of which Shaughnessy was one only, proceeding with an agency with no confirmation in writing, and no compensation agreed upon. Business men do not act in a manner so nonchalant. This was the direct testimony of the creation of the relation of principal and agent. The jury, of course, could have believed it. But it was not testimony carrying with it conviction by reason of its inherent probability. It was, on the other hand, suspicious testimony and, in and of itself, was entitled to little weight.

The circumstantial evidence consists of meetings at

which Richards attended and correspondence between the plaintiff and the President of the defendant company. And, says the court, whatever some of the letters of Richards standing alone might indicate as to the scope of the alleged agency, it cannot be denied that Richards was permitted to attend some of the meetings between Porter and Shaughnessy at which details culminating in the execution of the contract for the sale of the whiskey were discussed.

It is desirable that the precise ground upon which the action was founded be kept in mind. The suit was to recover commissions alleged to be due for services rendered in the sale or marketing, and in the procuring the sale or marketing of 8,000,000 gallons of whiskey of the value of $50,000,000. The Bill of Particulars so states.

The plaintiff testified that the agency was with respect to the sale of the whiskey or the controlling stock interest in the defendant company, which interest was held and owned by a corporation known as Sir Mortimer Davis, Incorporated. The shares of this latter corporation were held by the executors of the last will and testament of Sir Mortimer Davis.

Lord Shaughnessy testified that at the meeting with Nelson and Richards in August in Montreal the discussion was concerning the stock of the defendant company held by Sir Mortimer Davis, Inc., and that no price was fixed for the whiskey.

The fact of the creation of the relationship of principal and agent precisely as it was relied upon as a basis for the action is, of course, the vital issue. An examination of the correspondence is both proper and necessary.

The first letter was one from Nelson to Shaughnessy in his connection with Consolidated Distillers Corporation. It is dated June 27, 1933. In it Nelson stated that he had

a group that were prepared to buy for *cash* bonded warehouse receipts covering rye and bourbon whiskies in bond, which they understood covered whiskies over seven years old, and amounting in quantity to over 8,000,000 gallons. Prices were asked. To this Shaughnessy replied by telegram saying that any proposition from substantial people would be considered. This was followed by Nelson's letter saying that his friends were a group of Democrats with ample capital. This was followed by a meeting with Shaughnessy in New York at which Nelson would not disclose the names of his friends or group. Nelson then went to Montreal to see Shaughnessy taking with him one Higgins. Nelson admits that Higgins was not able to satisfy Shaughnessy as to his financial responsibility, so he passes out of the picture. Richards enters upon the scene through Nelson. Nelson testified that he told Shaughnessy who Richards was, and who he understood his friends and associates to be, and that he thought Richards was a likely person to find a purchaser either for the whiskey or for the stock of the defendant company which was owned by Sir Mortimer Davis, Inc. So, on August 22, 1933, Nelson wrote to Shaughnessy, as President of Sir Mortimer Davis, Inc., enclosing a letter from Richards. This letter was addressed to Nelson. It stated that Richards had thoroughly responsible people considering making a bid for the outright purchase of the entire holdings of the Estate of Sir Mortimer Davis, which, as he understood, represented control of the defendant company's stock.

On October 19, 1933, Nelson sent to Shaughnessy an unsigned letter expressing his failure to understand his reluctance to meet Porter, who was President of National Distillers Products Corporation, a "paramount" person in the industry. This letter was concerned with the stock of the defendant corporation held by Sir Mortimer Davis,

Inc. A proposal of Richards is mentioned indicating a plan calling for the formation of a corporation, and the exchange of cumulative and redeemable preferred stock, plus a bonus of common stock, for the shares of stock of the defendant company held by Sir Mortimer Davis, Inc. This letter was addressed to Shaughnessy as President of Sir Mortimer Davis Estate, Inc.

On August 25, 1933, just after the Montreal conference, at which the plaintiffs say the agency was created, Richards addressed a letter to Shaughnessy, as President of Sir Mortimer Davis, Inc., thanking him for a pleasant visit, and stating that he was proceeding along the lines "we discussed."

The next letter of Richards was of August 31st. It likewise was addressed to Shaughnessy as President of Sir Mortimer Davis, Inc., and referred directly and solely to the sale of the stock of the defendant company belonging to the estate. This letter referred to negotiations for the sale of the stock through a representative of Lady Davis, and Richards wanted Shaughnessy to write him that both he and Lady Davis were negotiating through him.

On October 9, 1933, Richards wrote Shaughnessy, still addressing him as President of Sir Mortimer Davis, Inc., outlining a plan discussed with Porter concerning the controlling interest in the defendant corporation.

The plan embraced the formation of an American corporation to be controlled, financed and operated by National Distillers Corporation of America, and an exchange of stock of the defendant company held by Sir Mortimer Davis, Inc., for a proportion of the preferred stock of the corporation to be formed.

Richards testified that Shaughnessy was insisting upon

some payment for the benefit of the Davis estate and that Porter said "Well, $250,000 won't stand in the way." So the next Richards letter, dated October 13, 1933, informed Shaughnessy that the matter of $250,000 would not stand in the way of a deal. This letter, as was customary, was addressed to Shaughnessy as President of Sir Mortimer Davis, Inc.

On October 18, 1933, Richards addressed a letter to Shaughnessy, still as President of Sir Mortimer Davis, Inc., stating that he had had a meeting with Porter and suggesting a conference in New York.

The next letter from Richards to Shaughnessy was dated October 27. It referred to a visit that Shaughnessy was to make to New York, and in it Richards invited Shaughnessy to be his guest at wrestling matches. Business affairs were not mentioned, and the letter was addressed to Shaughnessy personally.

Shaughnessy went to New York on November 1. Richards testified that he took him to Porter's office on the following morning, and there a conference was held between Shaughnessy, Wright, Vice-President of the defendant company, Porter, himself and Mr. Breede, a lawyer.

According to Richards he introduced Porter to Wright as strangers. But Shaughnessy, Porter and Wright deny this, and it appears without contradiction that Porter and Wright had been conferring for some months with respect to the very plan that was finally carried into execution.

Richards testified that Shaughnessy said that the plan of the exchange of stock was not practicable, and that then the conversation "drifted on to the matter of this third company;" that no price was established, and that he attended no further conferences.

So far then, we have the clearly painted picture of an abortive plan to take over the stock of the defendant company held by Sir Mortimer Davis, Inc., by an exchange of the stock for stock in a company to be formed. This proposed plan collapsed at this meeting. It is not denied that it had been found impossible to find the money with which to purchase the stock, or the whiskey.

As Richards says, the conversation between Shaughnessy and Porter then drifted to the formation of a third company, a marketing company. This plan had been discussed between Wright and Porter for several months, and with respect to which a memorandum had been reduced to writing in May, 1933.

Richards' next letter was dated January 5, 1934, after an agreement had been concluded between the defendant corporation and Porter's Company, National Distillers Products Corporation, providing for the formation of the marketing corporation. This letter, quite significantly, was addressed to Shaughnessy as President of the defendant company, and in it Richards wanted to know what provisions had been made for his compensation for having originated the business, arranging the negotiations and for introducing the particulars. Nelson's name was not mentioned.

To this letter Shaughnessy replied, stating that so far as he knew no compensation had been arranged for any one. He referred to the original discussion concerning a proposed plan relating to the acquisition of shares of Sir Mortimer Davis, Inc., which as he said, for various reasons had to be abandoned; that Porter had taken up with Wright (Vice-President of the defendant corporation) a situation which had been discussed for many months, and that the negotiations had continued on that basis ever since. He said that he did not want Richards to labor under any

misapprehension as to his relationship, for at no time was the defendant corporation interested in paying commission or compensation of any description.

On the same day Richards wrote Porter asking him what provisions had been made for his compensation, and to this Porter replied by the letter which the plaintiff finally succeeded in getting before the jury, the admission of which the court rightfully holds to be error.

The testimony strongly points to the conclusion that Richards and Nelson had failed to find a buyer for the whiskey or for the stock control of the defendant company. Their plan, or Porter's plan, strongly recommended by them, for the formation of a third company, and an exchange of shares of the defendant company owned by Sir Mortimer Davis, Inc., for shares of the new company, fell through for the very good reason that the executors of the Davis estate would not be justified in exchanging shares which had a market value for shares in a corporation to be formed. They had failed in their efforts, and when at the conference on November 2, Shaughnessy pronounced the plan for exchange of shares impracticable, and, as Richards himself testifies, the conversation turned to the formation of a marketing company with which Richards was not concerned at all, it is not surprising, I think, that Richards was not invited to attend further conferences.

It was after this conference that, according to Nelson, Shaughnessy said, "Jim, this will make you and Ernest independent for life," and, according to Richards, "Ernest, I will see that you are taken care of for life."

A doubt may be permitted whether the plaintiff's testimony is "ample" in the sense that it carries conviction.

We may pass over with bare mention Richards' want of candor as disclosed by his cross-examination. It will be

recalled that in his letter of August 22 to Nelson which was handed to Shaughnessy, there was the statement that he had thoroughly responsible people considering making a bid for "the outright purchase of the entire holdings of Sir Mortimer Davis." The cross-examination developed that at that time he represented no one, responsible or otherwise.

The testimony introduced by the defendant may not be ignored, for the admitted error cannot be determined to be prejudicial or non-prejudicial from a consideration of the plaintiffs' testimony alone.

Shaughnessy testified, and it was not denied, that Nelson first introduced Higgins as a buyer of some of the whiskies, but that it developed that Higgins had no capital and wanted to pay for the whiskey out of the profits he might make. Then came Murphy, but it was found that not "much cash could be expected from that source." Then Nelson pretended to represent Banc America Blair Corporation, but it was found that it was "not particularly interested, and that fell through." Then Richards appeared on the scene sponsored by Nelson.

Shaughnessy denied that he had ever appointed Nelson and Richards as sole agents for the sale of the whiskey or for the shares of stock. He denied that at the first Montreal interview there was any discussion respecting the sale of the whiskey as merchandise, or that any price therefor was fixed. He testified that his company had perfectly good selling agencies and did not require the services of a stock-broker who probably had no experience in the whiskey business to sell his whiskey. He admits, as they were brokers, considering discussing with them the sale of the shares of stock, if they had substantial people behind them.

The Richards correspondence was concerned with the

stock held by Sir Mortimer Davis, Inc. Nelson's letters point in the same direction. He wrote Shaughnessy, on July 8, inquiring if he would consider disposing of the stock interest of the Davis estate in the defendant corporation to a responsible banking group. On July 27, he telephoned suggesting that he represented Banc America Blair Corporation and inquiring specifically what amount of additional stock could be escrowed, optioned, or purchased. On August 2, he wrote at length to Shaughnessy stating that his proposition to the chairman of Banc America Blair was "to purchase outright the entire holdings of the Estate at $26.00 per share." There was also in evidence a telegram from Nelson to Shaughnessy, dated July 24, asking when the latter could meet "my people here with complete information about sale of control."

The correspondence, both Nelson's and Richards', tends to confirm Shaughnessy's contention. Apart from the testimony of the plaintiffs themselves there is little or no testimony of services rendered in selling or marketing, or procuring the selling or marketing of whiskey. The conferences and meetings at which Richards was "permitted" to attend are explained not only by the defendant's testimony, but by the plaintiff's own correspondence as being conferences at which the sale of the stock of the Davis estate was discussed.

Apart from the simple affirmative answer of Porter to an exceedingly leading question, "As a matter of fact, Mr. Porter, up until the time that Mr. Richards got into this situation no arrangement had been made with Canadian Industrial Alcohol Company, Limited, and it was not until he got into it that the arrangements were carried through, isn't that so?" there is practically no disinterested testimony in support of the case of the plaintiffs.

It was undisputed, as Porter testified, that his company,

National Distillers Products Corporation, had been in negotiation with officers of the defendant company concerning a possible purchasing or marketing arrangement for the defendant's product since the latter part of April, 1933; that, of course, nothing could be done until the accomplishment of the repeal of the Eighteenth Amendment; that it seemed impossible to carry through a straight purchase of the whiskey or the stock control because of the vast amount of money involved; and that when Shaughnessy first went to see Porter, on October 3, Porter's company had been in negotiation with the defendant company for some months. Porter testified that his company was familiar with the defendant's whiskies, and the whole situation, and that, in April there had been discussions between himself and an officer of the defendant corporation concerning the practicability of an agreement for the formation of a marketing corporation, and a contract similar to the one ultimately entered into, and that these discussions had never ceased.

Having in mind Richards' inquiry as to what provisions had been made for his services in "having originated the business," it may be permitted to inquire just what business Richards did originate?

The jury could, of course, deal with the testimony as they pleased, but, considering the testimony as a whole, there is no justification, in my opinion, for the court's conclusion that the evidence on the part of the plaintiff was so convincing that the admitted error worked no injury.

The court has laid down no rule for the determination of prejudicial error. It states in one place in its opinion that there was ample evidence, both direct and circumstantial of the existence of an agency agreement between the parties. What is meant by "ample" evidence in con-

nection with admitted error, I do not understand. The court cannot mean that where there is evidence upon which a verdict may be based the erroneous admission of testimony on a vital issue cannot be prejudicial. That sort of rule, satisfying as it may be to a trial court, is neither just nor reasonable. If the court meant to say that, apart from the testimony erroneously admitted, there was evidence of such convincing character that the verdict could not have been otherwise than it was, the answer is that the record does not bear out the conclusion.

It is easy to say that evidence improperly admitted could not have influenced the verdict, but the ability to penetrate the minds of others is not, I think, a human attribute.

There are cases, admittedly, where the evidence is so conclusive, or so preponderating, that the erroneous admission of testimony could not reasonably change the result. There are many cases where it is connected with an issue so immaterial that it has no significance. I am quite in agreement that there must be both error and injury. I am not proposing, in the phrase of Professor Wigmore, an exaltation of the rules of evidence. I am not wedded to the theory that error presumptively works prejudice to the party against whom it is committed, or to the theory that the admission of incompetent or irrelevant testimony is a violation of a legal right and, therefore, is fatal error. A rule that a new trial should be granted in every case where testimony has been erroneously admitted would be clearly unjust. On the other hand, since it is often difficult, and sometimes impossible for an appellate court to determine the effect which improper testimony may have on the minds of a jury, there are serious objections to a practice which permits speculation on the subject. 6 *Jones, Ev.*, § 2531.

I quite agree that there is no prejudice from the ad-

mission of improper testimony where other competent evidence is uncontradicted or overwhelming, 6 *Jones, Ev.*, § 2532; but, where the issue is vital and sharply contested, turning upon a question of fact as to which the evidence is in direct conflict and consisting principally of the testimony of the parties themselves, each in support of his own claim, a reviewing court ought not arbitrarily to conclude that improper testimony could have worked no injury. In such case the admission of irrelevant or incompetent testimony is almost necessarily harmful. 6 *Jones, Ev.*, §§ 2532, 2533; 4 *C. J.* 972, 999; *Missouri, K. & T. Ry. Co. v. Williams*, 63 *Tex. Civ. App.* 368, 133 *S. W.* 499; *Louisville & N. R. Co. v. Cornelius*, 183 *Ala.* 203, 62 *So.* 710; *Pratt v. Hamilton*, 161 *Mich.* 258, 126 *N. W.* 196; *McIntosh v. McNair*, 53 *Or.* 87, 99 *P.* 74; *Houston, etc., R. Co. v. Fox*, 106 *Tex.* 317, 166 *S. W.* 693; *Broadwell v. Conover*, 186 *N. Y.* 429, 79 *N. E.* 402.

Chief Justice Shaw, in *Thorndike v. City of Boston*, 1 *Metc. (Mass.)* 242, laid down what Mr. Jones says is a conservative rule by a great judge. It is,

"When evidence has been improperly received or rejected, and a verdict is found against the party taking the exception, and a motion for a new trial is made on that ground, such motion will not be granted, if the court can see plainly, from the whole evidence, that independently of the evidence received or rejected, the evidence in support of the verdict so decidedly preponderates, that a verdict the other way would be set aside as against evidence."

The New York Court of Appeals has announced this rule,

"When the evidence on each side is so nearly balanced that a determination either way would not be reversed upon appeal, it cannot be said that the losing party is not prejudiced by material evidence testified to by an incompetent witness against his objection." In re *Eysaman's Will*, 113 *N. Y.* 62, 20 *N. E.* 613, 616, 3 *L. R. A.* 599.

And, says Jones,

"So long as the chances are equal that it may have had some

effect one way or the other, the party excepting is entitled to the benefit of the principle that irrelevant testimony should be shut out from the jury." 6 *Jones, Ev.*, § 2533.

In 3 *Am. Juris., Appeal and Error,* 584, perhaps the latest general authority, it is said,

"Where there is such a conflict in the evidence that a determination either way would not be disturbed on appeal, it cannot be said that the losing party is not prejudiced by material evidence erroneously admitted."

*People v. Jose Gonzalez T. Fernandez,* 35 *N. Y.* 49, is cited and quoted by Professor Wigmore apparently with approval (*Wigmore, Ev., Vol.* 1, § 21). There it was said,

"The reception of illegal evidence is presumptively injurious to the party objecting to its admission; but where the presumption is repelled, and it clearly appears, on examination of the whole record, *beyond the possibility* of *rational doubt* [Italics mine], that the result would have been the same if the objectionable proof had been rejected, the error furnishes no ground for reversal."

I think it cannot be reasonably said, in view of the fact that the plaintiffs' case rested largely upon their own evidence which was sharply controverted not only by flat and uncompromising denials but by reasonable inferences to be drawn from the plaintiffs' own correspondence, that, if the verdict had been the other way, it could not have been supported.

*Townsend v. Poynter,* 3 *W. W. Harr.* (33 *Del.*) 53, 130 *A.* 267, cited by the court is, I think, of small authority. There the exception was based upon an improper and prejudicial remark of counsel for the plaintiff with respect to a witness for the defendant. The point as to which the witness testified was whether, when a collision happened, it was dark or light. His testimony was comparatively unimportant, as the court observed, and the defendant's contention was amply supported by other evidence. *Director General of Railroads v. Johnston,* 1 *W. W. Harr.* (31 *Del.*) 397, 114 *A.* 759, and *Philadelphia & R. Ry. Co. v.*

*Green & Flinn,* 2 *W. W. Harr.* (32 *Del.*) 78, 119 *A.* 840, are typical cases of harmless error.

*Hudson v. State,* 5 *W. W. Harr.* (35 *Del.*) 23, 156 *A.* 881, 80 *A. L. R.* 219, not cited in the court's opinion, involved, not an erroneous admission of testimony, but improper comment by the prosecution upon the failure of the defendant to call character witnesses.

This court reversed the judgment of conviction. The court said that a jury of lawyers would probably not be influenced by the comments, but that it might be very different with a jury of laymen; that theoretically the jury is to be influenced only by the evidence, but they cannot be expected to know that the State has injected something into the case which is not in evidence, when the court says it is unobjectionable; and that the reputation of a person sometimes tips the scale in weighing the evidence, and cannot be said to be cured by the charge on reasonable doubt.

The court went on to say that it was a basic principle of criminal law that a defendant has the right to be confronted by the witnesses and has the right to cross-examine them.

The same reasoning should apply here. The objectionable testimony went before the jury with the approval of the court. The jury's duty was to consider it as evidence. The presumption is that they did so. The testimony of Porter was by deposition. The defendant, of course, could not anticipate that the Porter letter would be allowed in evidence. It had no opportunity to cross-examine him upon the meaning of his statements, or, in any manner, to dissipate or lessen the force of them. The objectionable testimony may have tipped the scale. It is beyond human ability to say that it did not.

In the circumstances shown by the record the admitted

error was, in my opinion, prejudicial, and the court is not justified, in fact or in law, in assuming that the error was harmless.

The twelfth assignment of error is based upon the refusal of the trial court to grant a new trial upon the ground that the verdict was excessive.

Considering all the facts and circumstances the verdict was grossly excessive. Conceding that the plaintiff's efforts had something to do with the conclusion of the partnership arrangement between the defendant and the Products Corporation, the negotiations for which had been going on for months before they appear in the story, an award to them of a small fortune was unconscionable. It is easy to be liberal with other people's money. It was the duty of the court below and, as I think, the duty of the court here, to correct a palpable injustice.

The judgment should be reversed.

An application for a reargument of this case was made by the plaintiff in error, but that application was refused by a majority of the court on November 10, 1936.